## FORSTNER v. SPEIDEL et al.

(District Court, D. Rhode Island. October 17, 1924.)

No. 172.

**1. Partnership ⬤═232—Right to profit after withdrawal of capital held not intended as compensation for continued service in another firm dissolved by reason of war.**

Right under contract between partners to 10 per cent. profit of another firm afterwithdrawal of capital, which firm was created to take over part of business of original firm, *held* not to be considered as merely compensation for continued service to be rendered, but as part consideration for permitting creation of new firm, and it was immaterial that original firm was dissolved by war because one partner was alien enemy.

**2. War ⬤═12—Right of alien enemy to profits of partnership held merely suspended during war.**

Percentage of profits to which alien enemy was entitled out of business after withdrawal of his capital *held* merely suspended during war, and not terminated.

**3. Partnership ⟨=232—Defendants, having derived substantial benefits therefrom, not in position to rescind agreement to pay plaintiff profits after withdrawal of capital.**

Defendants having derived substantial benefits from agreement of partner to furnish capital for limited time to firm taking over part of business of old firm, and contract having been partly executed, they are no longer in position to rescind as to agreement to pay plaintiff 10 per cent. of profits after withdrawal of his capital from firm.

**4. War ⟨=12—Obligation of defendants to pay part of profits to enemy alien held not dissolved by treaty with Germany.**

Obligation of defendants to pay percentage of profits of firm to plaintiff, who had already performed his part of agreement, was not dissolved by Treaty of Peace with Germany, art. 2, par. 1, which incorporates part of Treaty of Versailles (42 Stat. 1939).

**5. Equity ⟨=54—Regards spirit, not letter, intent, not form, and substance, not circumstance.**

Court of equity regards spirit, and not letter; intent, and not form; and substance, rather than circumstance.

**6. War ⟨=12—Enemy alien held not entitled to compensation for use of capital by firm.**

Plaintiff *held* not entitled to interest on or compensation for use of his capital by defendant partners after he was declared an enemy alien.

In Equity. Bill by William Forstner against Albert Speidel and another. Plaintiff held entitled to decree for accounting.

Alexander L. Churchill, of Providence, R. I., for plaintiff.

William W. Moss (of Gardner, Moss & Haslam), of Providence, R. I., for defendants.

BROWN, District Judge. This is a bill in equity for an accounting, brought in this court on the ground of diverse citizenship.

The plaintiff claims under a contract called "the Automatic Gold Chain Company contract," executed on April 16, 1913, in Germany, in the German language, between parties who then were all German citizens, but have since become citizens of the United States. The parties differ as to the translation of the document, but for the purposes of the case we may use the Defendants' Exhibit F, which is as follows:

"Agreement between Messrs. Albert Speidel and Edwin Speidel of Pforzheim, owners of the Automatic Gold Chain Co. in Providence, on the one hand, and Mr. Wilhelm Forstner, of Pforzheim, partner in the firm of F. Speidel Co., in Providence, on the other hand, the following agreement has been made to-day:

"Article 1. Mr. Wilh. Forstner will participate as a silent partner in the Automatic Gold Chain Co., in Providence, as well as in possible allied firms, with 20% (twenty per cent.) in the capital, profits, and losses.

"Art. 2. The silent partnership of Mr. Wilh. Forstner in the Automatic Gold Chain Co. ceases with first of July, 1917, and Mr. Wilh. Forstner will have his capital paid back in four equal yearly installments, the first of which is to be paid July 1, 1918, and all bearing interest of 5 per cent., payable semiannually. This return of his capital may also be made earlier.

"Art. 3. The Automatic Gold Chain Co. agrees, as long as it may exist and one of Messrs. Albert or Edwin Speidel is partner, to pay to Mr. Wilh. Forstner or to his legal successor, who must be actively interested in the firm of F. Speidel Co., in Providence, after July 1, 1917, 10% (ten per cent.) of the future net profits of the Automatic Gold Chain Co. or of its allied firms, provided the net profits amount to at least M. 300,000 (three hundred thousand marks). If the net profits do not total this amount, neither Mr. Wilh. Forstner nor his legal successor shall be entitled to any share in the net profits.

"Art. 4. If before the expiration of the partnership agreement of the firm F. Speidel Co., in Providence, the Automatic Gold Chain Co. should be liquidated or get into other hands, whereby Mr. Wilh. Forstner would lose his 10 per cent. share according to article 3, Mr. Edwin Speidel agrees to cede 5% (five per cent.) of his silent partnership in the firm of F. Speidel Co., in Providence, to Wilh. Forstner while Mr. Wilh. Forstner agrees to pay to Mr. Edwin Speidel a sum equivalent to that share of the capital.

"Art. 5. The parties agree that Mr. Wilh. Forstner shall receive every month a copy of the balance sheet and upon request be allowed to inspect the inventory sheets and yearly balance sheets. The payments to Mr. Wilh. Forstner shall be made at the same time as payments are made to Messrs. Albert and Edwin Speidel.

"Art. 6. The capital paid in cannot be reduced without the consent of all partners.

"Art. 7. At the end of each fiscal year the books shall be balanced.

"In taking inventory the following deductions shall be made: 10 per cent. for the cost price of patents; 12 per cent. for machinery; 20 per cent. for furniture and fixtures.

"The net profits may be paid out as soon as the requirements of the business so allow.

"Art. 8. In case Mr. Wilh. Forstner or his brother, Walter Forstner, should die dur-

ing the duration of this agreement, and there is no legal successor to the surviving Mr. Forstner in the firm of F. Speidel Co., in Providence, then any possible share in the net profits will cease with the year of death of the surviving Mr. Forstner, as provided in Article 3, without any indemnity to the heirs.

"The present agreement was made in two copies and signed. Mr. Forstner as well as the Automatic Gold Chain Co. received each one copy.

"Pforzheim, April 16, 1913.
"[Signed]   Wilhelm Forstner.
      "Albert Speidel.
      "Edwin Speidel."

As the differences in translation and in interpretation arise principally out of Article 3, the original German text of that Article is presented as follows:

"No. 3. Die Automatic Gold Chain Co. verpflichtet sich, solange dieselbe besteht und einer der Herren Albert oder Edwin Speidel darin beteiligt ist, Herren Wilh. Forstner oder dessen Rechtsnachfolger, welcher an der Fa. F. Speidel Co. in Providence aktiv beteiligt sein muss, vom 1. Juli 1917 ab vom ferneren Reinverdienst der Automatic Gold Chain Co. oder deren Schwesterfirmen 10% (zehn Prozent) auszubezahlen, fur den Fall, dass der Reinverdienst mindest M. 300,000 (dreihunderttausend Mark) betragt. Sollte der Rein verdienst diese Summe nicht erreichen, so hat Herr Wilh. Forstner oder dessen Rechtsnachfolger keinen Anteil am Reinverdienst zu beanspruchen."

Under Article 3 the plaintiff seeks an accounting for 10 per cent. of the net profits made by the Automatic Gold Chain Company after July 1, 1917. The defendants contend that this agreement was terminated by the dissolution of the firm of F. Speidel Company, of Providence, ·as a result of the declaration that the plaintiff, William Forstner, was an alien enemy, and of the seizure by the Alien Property Custodian of his interest in the firm of F. Speidel Company, and by the subsequent sale of the assets of that company.

The defendants contend that under Article 3 the right to the 10 per cent. profits is expressly conditioned upon the continuance of the plaintiff, William Forstner, as an active partner in the firm of F. Speidel Company, and that upon the dissolution of that firm the performance of this condition became impossible, and also that the consideration for the promise of the defendants to pay the 10 per cent. profits had completely failed.

It seems to me that the substantial points in the case may best be understood by first considering the defendants' contention that the consideration for the agreement to pay 10 per cent. was that the plaintiff should continue in the firm of F. Speidel Company and by his continuance in that firm render valuable aid to the Automatic Gold Chain Company.

The contract in question grew out of an agreement between persons who were copartners in the F. Speidel Company for a division of the business of that established company and the formation of the Automatic Gold Chain Company, which should carry on a portion of the business formerly conducted by the F. Speidel Company. By an agreement of the same date, April 16, 1913, a translation of which appears in Defendants' Exhibit H, it was provided that the Automatic Gold Chain Company "will engage in the manufacture of articles made exclusively of gold, platinum, and platinum plated material, and that the F. Speidel Company will manufacture articles made exclusively of plated materials, silver, and base metals."

There are some specific provisions which, for the purposes of this case, are not important. There were also provisions against competition between the F. Speidel Company and the Automatic Gold Chain Company; also a provision for mutual aid in mercantile and technical activities; and a grant by the firm of F. Speidel Company to the Automatic Gold Chain Company of a license to use the Fessler patent in America.

As the plaintiff, William Forstner, was a member of the firm of F. Speidel Company and its active manager, his relation to the Automatic Gold Chain Company, so far as active services or duties are concerned, was as a partner in F. Speidel Company, and the agreements against competition and for mutual aid during the existence of both companies are covered by the separate agreement, "Exhibit H."

Upon the face of the contract in suit we find an agreement by William Forstner to participate as a silent partner with a 20 per cent. interest in capital, profits, and losses until the 1st of July, 1917, with provision for repayment to William Forstner of his capital in four equal yearly installments, the first on July 1, 1918, with interest at 5 per cent. payable semiannually. In articles 1 and 2 of the contract, the plaintiff's right to a 20 per cent. profit is not conditioned upon his remaining a member of the firm of F. Speidel Company. His right to the 20 per cent. is wholly personal. The contribu-

tion of 20 per cent of the capital, so far as appears upon the face of the contract, is the full consideration for the agreement to pay the 20 per cent. of profits during the period of the investment of capital.

Upon the face of the document, also, this contribution of capital for a period of four years and three months is a sufficient consideration for the promise contained in Article 3 to pay the 10 per cent. profit after withdrawal of capital, provided the net profits amount to at least 300,000 marks; but upon the evidence it seems apparent, also, that a valuable consideration moving from plaintiff to defendants was that he should assent to the division of the business of the firm of F. Speidel Company in order that the Automatic Gold Chain Company might be established.

Both parties have submitted computations of the values of the interest of William Forstner in the F. Speidel Company and in the Automatic Gold Chain Company; the plaintiff contending that there was a substantial sacrifice by the plaintiff of profits and chances of profits in the F. Speidel Company, and the defendants contending that there was no such sacrifice of profits, and that, as William Forstner's exchange of an interest of the F. Speidel Company for an interest in the Automatic Gold Chain Company was without loss or sacrifice, there was no other valuable consideration for the defendants' agreement to pay 10 per cent. after withdrawal by William Forstner of his capital than services to be rendered the defendants by the plaintiff or his successor through his continued participation in the firm of F. Speidel Company. This argument, of course, is much weakened by the fact that the relations between the two companies were defined in the supporting contract, Exhibit H.

Looking at the matter broadly, we have this situation: The plaintiff, who as copartner in F. Speidel Company was in the enjoyment of a share of the profits from all branches of the business of that company, agreed to a severance of a part of the business, which he testified had yielded about one-third of the profit, and agreed to part with that interest and to assist the establishment of the new business by a 20 per cent. participation in capital, profit, and loss. The parties also agreed that upon withdrawal of his capital he was thereafter to have a 10 per cent. profit, contingent upon the making of the very substantial profit of 300,000 marks. If that amount was not made, he was to get nothing.

It is impossible to treat this agreement to pay a 10 per cent. share of profits in excess of a sum which gives ample compensation to the defendants in the same light as an agreement to apportion shares between partners in accordance with their contribution of capital and services. The plaintiff desired a chance of profit in case the new business should prove successful, and this is plainly conceded to him. The money value of a chance like this was incapable of exact estimation at the time the parties entered into the contract. It is in the nature of a bonus in addition to agreed compensation proportionate to capital invested.

[1] That this right to the 10 per cent. profit was not considered to be merely as compensation for a continued service to be rendered after July 1, 1917, appears from Article 4 of the agreement in suit, which provides that, in case the Automatic Gold Chain Company should be liquidated or go into strange hands, whereby plaintiff would lose his 10 per cent. share provided in Article 3, he should receive compensation of 5 per cent. of Mr. Edwin Speidel's silent partnership in the firm of F. Speidel Company.

The defense of failure of consideration for the 10 per cent. agreement is based upon a clause in Article 3, "to pay to Mr. Wilhelm Forstner or to his legal successor, who must be actively interested in the firm of F. Speidel Co., in Providence, after July 1, 1917." Do the words "who must" refer both to William Forstner and his legal successor, or do they refer only to his legal successor? Upon this question expert testimony has been presented, and different translations are offered; but, so far as I am able to understand the matter, there is an ambiguity in both translations and also in the original German text. In view of the fact that the copartnership agreement of the F. Speidel Company, Plaintiff's Exhibit 4, contains provisions as to who shall have the right to become a successor to Mr. William Forstner and limits this successor to Mr. Walter Forstner, his brother, or to some unknown person who may be accepted by the others, it is reasonable to hold that the limitation merely refers to the successor, and was not intended to affect or modify the clause of Article 3, "as long as it may exist and one of Messrs. Albert or Edwin Speidel is partner." Had it been intended to limit this clause, it would have been natural to add to it, "and as long as William Forstner or his successor shall continue as an active partner in the firm of F. Speidel Company." William Forstner was already a partner in

the F. Speidel Company, and this partnership was bound to support the Automatic Gold Chain Company in the manner provided by the supporting agreement. The language, "who must be actively interested in the firm of F. Speidel Co.," while clearly appropriate to one who in the future might become a successor or assignee in accordance with the terms of the F. Speidel protective agreement, Defendants' Exhibit E, is not so clearly appropriate to one who already is an active partner in F. Speidel Company.

It is also in another connection pointed out in the defendants' reply brief that the plaintiff had acquired the right to retire whenever he wished from the active management of the F. Speidel Company under section 14 of Defendants' Exhibit E. This indicates that it was not the intent of the clause to require personal service as a consideration for the 10 per cent.

The right of the plaintiff to the 10 per cent. was not merely a personal right. It was assignable, but only to such an assignee as was provided under the F. Speidel Company contract, Defendants' Exhibit E. Though the plaintiff has the right to appoint a successor upon his retirement from the firm of F. Speidel, is it the intention to require him to do so in order to provide a consideration for the continued payment of the 10 per cent.? It seems clear that the successor would claim the right to the 10 per cent. merely as an assignee of the rights which William Forstner had acquired at the time of the execution of the contract —i. e., April 16, 1913—and prior to the appointment of any successor. It would be straining the construction to say that the right of that successor to 10 per cent. would depend upon services he himself should perform for the firm of F. Speidel Company, thus indirectly benefiting the Automatic Gold Chain Company.

The argument that the 10 per cent. payment is to depend upon continued executory service to be rendered in the firm of F. Speidel Company by William Forstner, or by one or more of his successors in such firm, and the defense that there has been a failure of such executory consideration which relieves the defendants of that obligation, is in my opinion unsound in that it ignores the principal consideration.

The clause is a requirement that the successor shall be a person such as is referred to in the F. Speidel partnership contract, but is not a requirement that William Forstner or a successor must continue to give service in this indirect way as an executory consideration for the 10 per cent. Nevertheless the defendants rely upon a construction that the plaintiff himself placed upon the document in arguing to the Alien Property Custodian that the F. Speidel Company should not be closed up because this would terminate his interest in the Automatic Company. See Defendants' Exhibit A. This interpretation made by the plaintiff in an attempt to save his interest in the F. Speidel Company, of course, does not fall within the rule that an interpretation made by the parties themselves will be given effect. This is an ex parte construction by the plaintiff, which he is at perfect liberty to change for purposes of litigation, and the letter in which he set forth his views of course creates no estoppel, and at most serves to show that the defendants' construction is not impossible or unreasonable.

While this letter shows that the plaintiff adopted the view that his right was conditional upon the continued existence of the firm of F. Speidel, it does not support the defendants' argument that there has been a failure of an executory consideration or of the original consideration. On the contrary, he asserts that he received the 10 per cent. silent interest as compensation for separating the Gold Chain part of the F. Speidel Company. His statement that his interest expired upon his retirement from the F. Speidel Company, which would take place upon a forced sale of that company by the Alien Property Custodian, is merely a statement of an opinion which in no way binds him.

According to the testimony of Albert Speidel the supporting agreement was also a consideration. He testified as follows:

"Mr. Forstner said, 'How is it about that third agreement, where the Speidel Company has to give support to the Automatic Gold Chain Company in machinery, in new inventions, in whatever way it can give support? I have no interest to give any support to the Automatic unless I get a share in the Automatic.' Then he says he should get 10 per cent. for every year, and I objected to it. I said, 'No.' I said, 'It wouldn't be right, and I am willing to give you 10 per cent. provided we reach the amount of 300,000 marks.' And then we agreed to that, his 10 per cent. amount recompensation for the agreement where he had to support us."

This does not support the contention that the 10 per cent. was compensation for an

executory service to begin after July 1, 1917. Under the third agreement referred to by the witness—i. e., the supporting agreement, for which plaintiff was to have "10 per cent. amount recompensation for the agreement where he had to support us"— the obligation to support was to begin at once upon the execution of the contract in suit and the supporting contract.

The supporting contract was in force during the whole period from 1913 until the dissolution of the F. Speidel Company, and therefore a large part of the consideration for the 10 per cent. payments after the withdrawal from the Automatic of William Forstner's share of the capital of the Automatic Gold Chain Company was an executed consideration. The defendants have had the benefit of that support.

What was the true consideration for the agreement made on April 16, 1913, that after July 1, 1917, 10 per cent. of profits over 300,000 marks should be paid? As we have said, upon the face of the document the original contribution of capital as a silent partner was consideration both for the payment of 20 per cent, and for the payment of 10 per cent. of profits over 300,000 marks. If we accept the testimony of the defendant Albert Speidel as to the reason for the introduction of the 10 per cent. clause (that is, "the recompensation for the agreement where he had to support us"), then the further consideration moving from William Forstner was an agreement to support throughout the period of his silent partnership in the Automatic as well as afterwards. Furthermore, the separation of the Gold Chain business was a further consideration.

Whatever the true construction of the contract, it is evident that the plaintiff has furnished and the defendants have enjoyed the benefit not only of the separation of the Gold Chain business and the capital investment in the Automatic Company, but of the active services of William Forstner in the F. Speidel Company during the period which established the business of the Automatic Company and enabled it to make a profit in excess of 300,000 marks.

We cannot accept the view that the 10 per cent. commission was in the nature of payment day by day for services of William Forstner or his successor after July 1, 1917. We must take the arrangement as a whole, and upon this view it is apparent that the defendants have had the advantage of performance on the part of the plaintiff of his obligations up to the time of the dissolution

1 F.(2d)—63

of F. Speidel Company. What was the effect of that dissolution?

There is nothing in the testimony in this case which warrants a conclusion that as a matter of fact the Automatic Company lost anything of value by the winding up of F. Speidel Company. As it has made over 300,000 marks profit, thus passing that mark of prosperity which gave rise to the plaintiff's right to a share in the venture, the defense of a breach of a condition of continued activity of William Forstner in F. Speidel Company seems without any substantial foundation in fact, and a mere attempt to gain an inequitable advantage by resort to the letter of the contract.

The discontinuance of the plaintiff's activities in F. Speidel Company upon the dissolution of that firm was not a voluntary breach of contract. The partners on both sides being alien enemies, that partnership was dissolved by war. I can see no justification for the attempt of the defendants to relieve themselves from the obligation fully incurred before the war. If there was in fact anything to be done by William Forstner which he did not do, and which, if done, would have brought a profit to the defendants, to that extent it might be just to diminish his compensation; but no evidence has been offered in this case to show that there is any substance or substantial merit in the defendants' contention.

[2] What detriment resulted to the Automatic Company from the dissolution of the F. Speidel Company? Its continued existence, of course, was essential to the fulfillment of the condition. It was also essential to the performance by the Automatic Company of its agreement to support the F. Speidel Company. It was relieved of this obligation. There has been a substantial difference in conditions arising simply from the state of war, and, so far as it appears, accruing greatly to the advantage of the defendants and being in no wise detrimental to them. In the absence of any testimony to show any actual detriment to the defendants, I think that full effect should be given to the rule that when the consideration is not executory but executed, the plaintiff's rights to payment are merely suspended during the war, and that defendants are accountable to the plaintiff for the full 10 per cent. of profits.

I am of the opinion that the defendants' obligation to pay 10 per cent. when the profits exceeded 300,000 marks was based upon the plaintiff's contribution of capital for a limited period; that if the provision

of article 3 be read to require that Mr. William Forstner must be actively interested in the firm of F. Speidel Company, that condition—if it became impossible of performance through an act of war without actual detriment in fact to the defendants—may be disregarded for the purposes of the present case; that there cannot be found in Article 3 any agreement of sufficiently definite character to require Mr. Forstner to render any services to the Automatic Gold Chain Company in consideration of the payment of 10 per cent. His mere status as a partner of the firm of F. Speidel Company would answer the letter of Article 3. If the consideration of mutual support, contained in the supporting contract, can be said to have failed, it must also be said that it failed after it had been in effect for about four years, during the period when it would be of greater service to the Automatic Company, and that there is no evidence that it would have been of any service after that time, or that the F. Speidel Company would have been required to perform any active services.

It is entirely equitable for the plaintiff to say that, despite the necessary interruption of war, and despite the inevitable destruction of some of the conditions contemplated, the contract has been substantially performed by the plaintiff, though the letter of the agreements can no longer be fulfilled. Unless the defendants can show that it would be unjust to them—not in theory, but in fact—to call upon them to fulfill their obligations, fully assumed for valuable consideration long prior to the war, the plaintiff still has a right to an accounting in accordance with the original agreement.

[3] I am of the opinion that the plaintiff is right in his contention that, the contract having been partly executed and the defendants having derived substantial benefits, they are no longer in a position to rescind the contract.

[4] The defendants also contend that the plaintiff is barred by the treaty of peace with Germany (42 Stat. 1939). It is argued that paragraph 1 of Article II of the Treaty of Peace with Germany incorporates section 1 of part IV and parts V, VI, VIII, IX, X, XI, XIV, and XV of the Treaty of Versailles. Part X, § 5, art. 299, par. (a), is quoted:

"Any contract concluded between enemies shall be regarded as having been dissolved as from the time when any two of the parties became enemies, except in respect of any debt or other pecuniary obligation aris-ing out of any act done or money paid thereunder, and subject to the exceptions and special rules with regard to particular contracts contained herein or annexed hereto."

Unless we can accept the defendants' contention that the obligation to pay the 10 per cent. was in consideration for executory services to be performed after July 1, 1917, by the plaintiff or his successor, the present contract—even if we assume that it can be properly described as a contract concluded between enemies—is directly within the exception as a pecuniary obligation arising out of acts done.

While the three contracts which were executed on April 16, 1913, namely, (1) the Automatic Gold Chain Company contract in suit; (2) the supporting contract; (3) the contract modifying the copartnership agreement of Messrs. F. Speidel Company —may be read together, they do not constitute a single agreement. On the contrary, the parties were dealing with three separable subjects. The present contract contains no direct or inferential requirement that any active services should be performed either by the plaintiff or his successor, or that any new or independent consideration should be furnished in order to maintain the right to the 10 per cent. Nevertheless it is contended that, aside from the question of consideration, the clause, "who must be actively interested in the firm of F. Speidel Co.," imposes a condition, and, as that condition is impossible of fulfillment, the plaintiff's right is thereby arbitrarily determined. It is possible that this clause was intended to provide for the termination of the 10 per cent. payments at the same time as the termination of the F. Speidel Company partnership agreement, as provided in the original agreement of January 1, 1912, as modified by the agreement of April 16, 1913, or upon the final withdrawal of the plaintiff and his successor from that firm.

[5] Assuming this to be so, it is evident that the parties did not contract in view of the possibility of a state of war. The condition becomes impossible of performance through the fault of neither party. The question whether it is severable or nonseverable is not merely a verbal question. A court of equity regards the spirit, and not the letter; the intent, and not the form; the substance, rather than the circumstance.

If, in fact, the relations between the Automatic Company and F. Speidel Company were such that the destruction of the F. Speidel Company was a serious detriment to the Automatic Company, it might be impos-

sible to ignore the nonfulfillment of the condition. It is true that a court of equity cannot make a contract for the parties, but a court of equity may prevent a forfeiture, and it may hold that there has been substantial performance, though the letter of the contract has not been fulfilled. Upon the question whether it would be equitable to enforce the contract, the question of the true consideration is of great weight, if not controlling.

While it seems to me that, according to the preferred construction of this contract, the phrase "who must be actively interested in the firm of F. Speidel Co." applied to the successor, and not to the plaintiff, yet the other construction is not unreasonable, if intended merely as fixing a period of termination of the 10 per cent. payments. The maintenance of the agreement for a division of the business and for noncompetition would be a substantial matter, and the contract of the F. Speidel Company to that effect would not necessarily terminate with the withdrawal of the plaintiff or his successor from active participation in that firm.

It appears in the testimony of the plaintiff that he has been making gold chain for about a year. This, it is said, is a competition with the Automatic Company, which is contrary to the letter and spirit of the supporting agreement.

It may be that the period of the accounting should terminate with the date at which the plaintiff began to compete. We should consider the equities of the parties to the contract in suit, as affected both by the winding up of the F. Speidel Company and by the termination of the contract for support and noncompetition. Upon this question a further hearing may be necessary to determine the final date for the accounting.

I am of the opinion that the plaintiff is entitled to a decree for an accounting, and that the case should be referred to a master to take an account of the defendants' profits to the date of filing the bill, or up to the date of the beginning of plaintiff's competition, as may hereafter be determined.

The parties will be heard further upon the question of the termination of the period of accounting.

[6] Upon the question of interest upon or compensation for the use of plaintiff's capital after the plaintiff was declared an alien enemy, I am of the opinion that the defendants must prevail. See opinion of the Circuit Court of Appeals for this circuit in Miller, Alien Property Custodian, v. Mayer, 1 F. (2d) 419, September 18, 1924.