249 A.2d 407.

MARY M. RYMANOWSKI *vs.* JOSEPH A. RYMANOWSKI.

JANUARY 29, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

90

KELLEHER, J. This is an appeal by a resident of Massachusetts from a decree of the family court denying and dismissing her petition which was instituted pursuant to the pertinent provisions of the reciprocal enforcement of support act.

The parties to this proceeding were married in Chelsea, Massachusetts on Valentine's Day, February 14, 1953. They resided together in that city for almost nine years. No children were born of this marriage. The respondent was a member of the United States Navy being stationed during most of this time at various installations in the New England area. In 1962 he left the marital domicile and moved into quarters furnished him by the Navy at the air station at Quonset Point, Rhode Island. On August 14, 1962, respondent commenced divorce proceedings against petitioner in the Commonwealth of Massachusetts. The record discloses that on April 3, 1963, a decree was entered in the probate court of Suffolk County which denied respondent's prayer for divorce and directed him to pay his wife $180 a month for her support.

In 1964 respondent commenced another effort to sever his marital bond. While assigned to Quonset Point, Mr. Rymanowski returned to his native state of Minnesota and there filed a second petition for divorce from his wife. He discontinued this petition in the late summer of 1964.

The respondent retired from the Navy in May 1965 with the rating of a chief petty officer. At the time of his retirement, respondent was still stationed at Quonset Point. He returned to Minnesota to seek employment in some endeavor in which he could use the skills he had acquired during his 18 years of service. From Minnesota respondent traveled to Massachusetts where he filed a motion to reduce the monthly amount due his wife according to the April 1963 decree. His efforts were successful. A new decree was entered in the probate court on May 20, 1965, which reduced the amount to be paid to petitioner to $100 a month.

The respondent returned to Minnesota for a brief sojourn and then headed west. He arrived in Las Vegas, Nevada, on June 7, 1965. While in that city, he worked at various jobs and on July 20, 1965, filed his third petition for divorce. Mary received notice of the Nevada proceedings but neither she, nor any attorney on her behalf, participated in this litigation. On August 17, 1965, the district court for the Eighth Judicial District for the State of Nevada entered a default judgment against petitioner, granting Joseph's petition for divorce on the grounds that the parties had lived separate and apart for three years. The Nevada decree made no provision for petitioner's support.

Mr. Rymanowski remained in Nevada until November 1965 when he returned to Rhode Island to assume a civilian position at Quonset Point. In January 1966, he remarried. One child has been born of this marriage.

Shortly after the Nevada proceedings ended, petitioner invoked the aid of the Massachusetts courts. She filed a petition in the Suffolk County Probate Court asking for a declaratory judgment regarding her marital status with

respondent. Notice of the pendency of the suit was given by publication. The respondent did not participate in the Massachusetts action. On December 6, 1965, the probate court entered a decree which held that respondent's Nevada divorce was "invalid and void," and that he was still married to petitioner, and that her living separate and apart from respondent was justifiable.

Thereafter, petitioner went to the Chelsea District Court and began the present support proceedings. Under Massachusetts law, the district court is the designated tribunal in which to institute a petition under the reciprocal support act. Due and legal service of the petition was made upon Joseph in Rhode Island. Both he and Mary testified in the family court. It is respondent's position that Mary cannot prevail on her petition because he owes her no duty of support, since according to the Nevada decree she is no longer his wife.

Hearings in the family court were restricted to the validity of Joseph's Nevada divorce. The trial justice found that at the time of the institution of his Nevada suit, Joseph was a bona fide domiciliary of Nevada and accordingly he gave full faith and credit to the August 17, 1965 divorce decree and thereupon denied and dismissed the instant petition.

This appeal raises two issues. They are the correctness of the trial court's finding as to Joseph's Nevada domicile and secondly, if the Nevada decree severed the litigants' matrimonial ties, did it also effectively terminate Joseph's duty to support Mary.

## Marital Status

The Nevada divorce decree was wholly ex parte. According to the well-established rule in *Williams* v. *North Carolina*, 317 U. S. 287, 63 S. Ct. 207, 87 L. Ed. 279, full faith and credit under Art. IV, Sec. 1 of our United States Con-

stitution[1] must be afforded by all states to an ex parte divorce decree. In the second *Williams* case, *Williams* v. *North Carolina*, 325 U. S. 226, 65 S. Ct. 1092, 89 L. Ed. 1577, this rule was further defined. There the Supreme Court held that all states are entitled to determine for themselves the jurisdictional facts upon which a foreign decree is based and to withhold full faith and credit if not satisfied that the party asserting the foreign divorce was properly domiciled within the divorce-decreeing sister state at the time the divorce was granted.

The petitioner urges that the Massachusetts declaratory judgment which described the Nevada decree as a nullity is binding on us on the question of Joseph's domicile. We do not agree with this contention. To ·dispel petitioner's argument we need look only to the words of Mr. Justice Frankfurter in the second *Williams* case where he stated, "In short, the decree of divorce is a conclusive adjudication of everything except the jurisdictional facts upon which it is founded, and domicil is a jurisdictional fact. To permit the necessary finding of domicil by one State to foreclose all States in the protection of their social institutions would be intolerable." Thus, under *Williams* each state is permitted to make its own inquiry as to a party's domicile and no state's determination can bind another on this issue.

In *Nevin* v. *Nevin*, 88 R. I. 426, 149 A.2d 722, this court considered the elements of proof necessary to establish a domicile for a divorce in a state other than Rhode Island. There we affirmed the language found in *McCarthy* v. *McCarthy*, 45 R. I. 367, 122 A. 529, which stated "To establish a domicile and become a domiciled inhabitant there must be an actual abode in the state with the intention in good

---

[1]That clause states:

"Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state. And the congress may by general laws prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof."

faith to live here permanently and without any present intention of changing the home in the future. Actual residence without such intention does not suffice. In the absence of constitutional or statutory requirement in regard to domicile the length of the residence is immaterial provided the other elements are found to exist." The question of whether one has established a legal domicile is one of fact. See *Fosdick* v. *Fosdick,* 15 R. I. 130, 23 A. 140.

At the hearing in the family court Joseph testified as to the circumstances surrounding his journey to Nevada. He maintained that his residence in that state was primarily due to his efforts to obtain suitable employment. He described certain advertisements in the Minneapolis newspapers which sought to induce skilled workers to come to Nevada. He also pointed out that even if he did not obtain employment, the unemployment compensation benefits available to him in Nevada were superior to those afforded by the state of Minnesota. He testified that it was only after he had been in Las Vegas for about two weeks that a conversation with his landlady, whose brother was a local attorney, led to his filing for divorce. He left Nevada, he said, because he received an offer of a better position at Quonset Point.

The petitioner directs our attention to the degree of proof needed to establish a domicile here in this state by a person instituting divorce proceedings in Rhode Island. Citing our ruling in *Parker* v. *Parker,* 103 R. I. 435, 238 A.2d 57, she urges that Joseph must show "clear and convincing evidence" that he was domiciled in Nevada and that when viewed in the light of this standard the proof adduced at the hearing at the family court was insufficient. In our opinion petitioner misconceives our holding in *Parker.* There we were dealing with the burden of proof required of a person who, claiming to be a domiciled inhabitant of our state, seeks to obtain relief under our divorce laws. Undoubtedly this is a proper standard which we may exact

of those making use of our courts in such matters to insure that no fraud is perpetrated upon this jurisdiction, and to uphold the state's interest in maintaining regularity in divorce proceedings. *Carvalho* v. *Carvalho*, 97 R. I. 132, 196 A.2d 164.

However, when a domiciliary of this state relies upon a foreign divorce decree for a determination by this jurisdiction of his lawful marital status, a different situation arises. Certainly a decree of a sister state enjoys a presumption of validity in the courts of Rhode Island. See 3 Nelson, (2d ed.) *Divorce and Annulment*, §33.80, p. 597. In *Esenwein* v. *Commonwealth*, 325 U. S. 279, 65 S. Ct. 1118, 89 L. Ed. 1608, it was held that the full faith and credit placed a duty on the Pennsylvania courts to afford prima facie validity to the Nevada decree. In the second *Williams* case, the Supreme Court declared that Nevada's finding that it had jurisdiction was entitled to "respect and more." Thus it is the burden of the party asserting the invalidity of a divorce in another state to prove the absence of a domicile by the spouse in the foreign jurisdiction.

It is our belief that because our state has a substantial interest in upholding the marital status of its own domiciliaries and the legitimacy of any issue born of a subsequent marriage,[2] the quantum of proof necessary to invalidate such a foreign decree should be greater than the burden in the ordinary civil action. Accordingly, we feel that the degree of proof set forth in *Parker* v. *Parker, supra,* is applicable here, and that a party who comes from without

---

[2] In *Estin* v. *Estin*, 334 U. S. 541, 68 S. Ct. 1213, 92 L.Ed. 1561, Mr. Justice Douglas stated at p. 546:

"Marital status involves the regularity and integrity of the marriage relation. It affects the legitimacy of the offspring of marriage. It is the basis of criminal laws, as the bigamy prosecution in *Williams* v. *North Carolina* dramatically illustrates. The State has a considerable interest in preventing bigamous marriages and in protecting the offspring of marriages from being bastardized. The interest of the State extends to its domiciliaries."

our state to attack the marital status of one domiciled here must sustain that attack by clear and convincing evidence. In so holding, we do no more than articulate the burden of proof which is required in such cases by the mandate of our supreme court. In the second *Williams* case the court stated "The burden of undermining the verity which the Nevada decrees import rests heavily upon the assailant." See 3 Nelson, (2d ed.) *Divorce and Annulment,* §33.81, p. 599.

Here the family court observed that while some of Joseph's meanderings might tend to arouse suspicion, the uncontradicted testimony showed that he went to Nevada with the intention of becoming domiciled there and making that state his home and that he left only because of an opportunity for better employment.

From our review of the record, we believe that the trial justice's finding that Joseph was a bona fide domiciliary of Nevada was correct. Furthermore, the burden was upon petitioner to show the absence of any such domicile and her efforts in this regard fell far short of what is required. We will not, therefore, disturb the ruling of the lower court that Rhode Island should afford full faith and credit to respondent's Nevada divorce decree.

### Petitioner's Right To Support

The sole issue presented in this portion of our opinion is whether or not, after affording full faith and credit to the ex parte decree obtained by respondent, our action in this regard necessitates a further finding that petitioner's right to support has terminated. In reaching a conclusion on this query, we are guided both by pronouncements of the United States Supreme Court, and our view as to the intent of the legislature when it enacted the uniform reciprocal enforcement of support act.

The concept of "divisible divorce" initially foreshadowed by the Supreme Court in two concurring opinions in the

case of *Esenwein* v. *Commonwealth, supra,* was first announced by a majority of that court in *Estin* v. *Estin, supra.* There it was decided that a Nevada court which had no personal jurisdiction over the wife had no power to terminate the husband's obligation to provide for her support as required by a preexisting New York separation decree. This rule clearly founded upon well-established due process considerations, announced in *Pennoyer* v. *Neff,*[3] 95 U. S. 714, 24 L.Ed. 565, was stated as follows: "The result in this situation is to make the divorce divisible—to give effect to the Nevada decree insofar as it affects marital status and to make it ineffective on the issue of alimony." Later in *Vanderbilt* v. *Vanderbilt,* 354 U. S. 416, 77 S. Ct. 1360, 1 L.Ed.2d 1436, the court expanded the scope of "divisible divorce," by holding that the rule in *Estin* was not limited to instances where the wife had obtained her support order prior to the husband's acquisition of a foreign divorce decree but was likewise applicable where the wife had secured her order for support in her own state subsequent to finalization of the foreign divorce decree.

Since the "broad and novel"[4] declaration of the court in *Estin,* a steadily increasing number of states have brought their domiciliaries within the protection it affords by adopting the rule that a valid ex parte divorce does not operate to cut off the spouse's right to support. See *Hudson* v. *Hudson,* 52 Cal.2d 735, 344 P.2d 295 and related Note, *Conflict of Laws: Divisible Divorce in California,* 48 Cal. L. Rev. 303; *White* v. *White,* 83 Ariz. 305, 320 P.2d 702; *Hopson* v. *Hopson,* 95 U. S. App. D.C. 285, 221 F.2d 839, 847; *Willoughby* v. *Willoughby,* 178 Kan. 62, 283 P.2d 428; *Davis* v. *Davis,* Ky., 303 S.W.2d 256; *Vanderbilt* v. *Vanderbilt,* 1 N.Y.2d 342, 135 N.E.2d 553. The reasons for this

---

[3]That case stands as a landmark decision holding that no state can bind a defendant personally without lawful jurisdiction over his person.

[4]Morris, *Divisible Divorce,* 64 Harv. L. Rev. 1287, 1291.

polarization are clear. The *Estin* rule does no more than carry over traditional notions of due process to the field of domestic relations. It speaks in terms of "property rights" possessed by the wife and declares that these cannot be affected by a divorce-decreeing state that lacks personal jurisdiction over her. But, in order for the rule in *Estin* to accrue to the advantage of such a spouse, her "property rights," *i.e.*, her right to support, must continue under the laws of her own state after the husband has succeeded in severing the marital bond. Otherwise, the *Estin* rule does not benefit her, because if the policy of her own jurisdiction denies the survival of support rights after the entry of a valid decree of divorce, then her property rights would be terminated by the law of her own state, and not by the law of a foreign jurisdiction. Thus it is, that more and more states in order to protect the property rights of their domiciliaries have adopted the view that the right to support is not terminated by a valid ex parte divorce decree. Some have accomplished this objective by legislative fiat and others have realized this goal by judicial decision. See Annot. 28 A.L.R.2d 1378 and later case service for extensive treatment of this subject.

Ordinarily, when a state is cast in a role of "third state," as we are in the proceedings before us, the course to be followed is to determine the law of the wife's domicile as to the survival of support rights and to utilize that law as the basis for decision. See: *Hudson* v. *Hudson, supra; Lewis* v. *Lewis,* 49 Cal.2d 389, 317 P.2d 987; *Worthley* v. *Worthley,* 44 Cal.2d 465, 283 P.2d 19. We will not adhere to that procedure for two reasons. First, we do not, on the record before us, have any evidence of the law of Massachusetts. It is well settled that in such circumstances this court will not of its own initiative take judicial notice of the law of another state. *Potemkin* v. *Leach,* 65 R. I. 1, 13 A.2d 250. Secondly, we feel that the legislature's enactment of chap.

11, title 15, the uniform reciprocal enforcement of support act, reflects a broad and important declaration of public policy which we cannot ignore. We will, therefore, determine petitioner's rights wholly upon the law of this state.[5]

In *Wilford* v. *Wilford,* 38 R. I. 55, 94 A. 685, this court held that the wife's right to alimony survives a valid divorce subject only to the defenses of laches and waiver. There both parties appeared before our superior court and the divorce decree made no provision for alimony. Our ruling was that the wife had not surrendered her right to alimony by failure to make a claim for it within the six-month limitation necessary under the statute providing for alimony in lieu of dower, but could bring a petition at any time after final decree subject to the above-mentioned defenses. Having held that a wife's right to alimony is incidental to, but separate from a divorce decree granted within our state, we feel no hesitancy in holding that a wife's right to support also continues undiminished when her spouse leaves our state and obtains a divorce in another state where the foreign court never had personal jurisdiction over her. We do not consider the nomenclature of petitioner's right to be determinative here. The pertinent statute directs us to follow the course of equity.[6] In so doing, we rely upon our inherent powers in equity to look to the substance rather than the form of the right asserted. See: *Hudson* v. *Hudson, supra; Hopson* v. *Hopson, supra; Forstner* v. *Speidel,* 1 F.2d 988 (d.c. R. I.); 76 Harv. L. Rev., 1233, 1241. We feel that it makes little difference

---

[5]See, Currie, *Selected Essays on the Conflict of Laws,* chap. 13, pp. 663-670 for an informative discussion on the effect of ex parte divorce decrees on the right to support and the correct law to be applied in such cases.

[6]See G. L. 1956, §§15-11-23, as amended, and 15-11-31:

"15-11-23. Proceedings following course of equity.—All proceedings shall follow the course of equity so far as the same is applicable. * * *"

"15-11-31. Appeals.—Appeals from orders of the court of this state shall be to the supreme court and shall follow the course of equity * * *."

whether petitioner's claim is designated as one for "support" or "alimony." What is important is that respondent here has so far avoided his responsibilities arising out of his marriage by simply absenting himself from Massachusetts.

[8] Throughout these proceedings respondent has maintained the reciprocal support statute is applicable only when there is continuing marital relationship between the parties. We disagree.

Today, we live in a society of remarkable mobility. A Rhode Islander, besieged with wanderlust may, upon payment of the proper fee, be jet-propelled across this vast continent within a matter of hours to one of our sister states bordering the Pacific Ocean. Whether by plane, train or automobile, this increased mobility of our population has given rise to another problem. Occasionally, one who is charged with the duty of support, finds the call of the road irresistible. Prior to reciprocal support legislation, the dependents of one so irresponsible were left in a woeful state to fend for themselves. In most instances they could not afford to pursue the slacker for whom sanctuary from the rightful demands of support was assured in another state. Accordingly, the primary purpose for enactment of this legislation was to provide a vehicle through which dependents might obtain support from those who seek to avoid their obligations by the simple expedient of crossing state lines. In our opinion, chap. 11 of title 15 is an act remedial in nature,[7] that should be liberally construed for the purposes for which it was enacted. As the Massachusetts Supreme Judicial Court said in *M.* v. *W.*, 352 Mass. 704, 707, 227 N. E. 2d 469, 471, "* * * every 'endeavor should be made . . . to render this support statute operable.' "

---

[7]Section 15-11-3 provides that the remedies set forth in the act are in addition to and not in substitution for any other remedies.

We believe that the petitioner in this case is entitled to prosecute her petition for support. To hold otherwise would nullify the legislature's efforts to require a spouse domiciled in Rhode Island to discharge his obligations assumed on his wedding day.

The petitioner's appeal is sustained, the decree appealed from is reversed and the cause is remanded to the family court for further proceedings.

*Ira L. Schreiber,* for petitioner.

*Carmine R. DiPetrillo,* for respondent.