**STAR ENTERPRISE, Plaintiff,**

v.

**R. Harold THOMAS, Camella Thomas and C.L. Enterprises, Inc., Defendants.**

**Civ. A. No. 89–0615B.**

United States District Court, D. Rhode Island.

Feb. 19, 1992.

Richard Borod, Edwards & Angell, Providence, R.I., for plaintiff.

Lou Lawrence Goldberg, Warwick, R.I., Robert Weiner, Michael Murphy, Boston, Mass., for defendants.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

In this diversity action, plaintiff Star Enterprise (Star), as assignee, seeks specific performance of a $90,000.00 purchase option contained in a July 15, 1968, lease from defendants R. Harold Thomas and Camella Thomas to Texaco, Inc. (Texaco).

. Mr. Thomas began his business relationship with Texaco in 1963 as an operator of a Texaco gasoline service station in Peacedale, Rhode Island. In 1968, Thomas approached Texaco about the possibility of building a service station on property located in Wakefield, Rhode Island. He was adamant that he would own the service station property. Mr. and Mrs. Thomas agreed to purchase a tract of land on Tower Hill Road in Wakefield subject to necessary zoning and other permit approval to construct and operate a gasoline filling station. Meanwhile, Texaco had introduced Mr. Thomas to banks which were considering granting him a mortgage to finance the project. Ultimately, Mr. Thomas obtained a $50,000.00 mortgage from Industrial National Bank. The term of the mortgage was 15 years. The monthly payment due on the mortgage was $463.00.

After some delay, a meeting took place on July 15, 1968, between Mr. and Mrs. Thomas and Walter Burnes, who was Texaco's Merchandising Marketing Representative in Rhode Island. The meeting took place at the office of an attorney who professed not to represent any of the parties but participated as notary public. In all, the meeting took about twenty minutes. There is a dispute as to what occurred at the meeting. There is testimony that several changes were made to the forms which had been provided by Texaco and seen for the first time by Mr. Thomas at the meeting. Mr. Thomas testified that he asked Mr. Burnes about a provision in the lease from the Thomases to Texaco which granted Texaco an option to purchase the property for $90,000.00 at any time during the initial 15–year term of the lease or during either of the two 5–year extension periods. He further testified that Burnes stated, "this [purchase option] is standard procedure with all Texaco leases. It is what they require from every dealer. It's nothing to worry about. I've never known Texaco to exercise an option. There's nothing to worry about. As long as you're alive and Mrs. Thomas is alive, Texaco will never exercise that option." Mr. Burnes did not recall this discussion. During the meeting, three documents were signed by the Thomases and delivered to Mr. Burnes.

The first document signed was a lease from Mr. and Mrs. Thomas to Texaco for a term of fifteen years with two additional five-year renewal options granted to Texaco. The monthly rental to be paid by Texaco was $463.00, the same amount as the monthly mortgage payment due Industrial National Bank from Mr. Thomas. The initial term of the lease was to run from the date certain improvements were completed by the lessee and accepted by the lessor.

The rent during the option periods was to be calculated at the rate of .01 cent per gallon of lessee's gasoline delivered to the premises for each calendar month.

The second document signed by the Thomases was a lease of the premises from Texaco to the Thomases for a one-year term running from September 8, 1969, to September 7, 1970, and thereafter from year to year, terminable by either party on notice. The rent was again $463.00, and during any renewal option period, the rent due from the lessee, Mr. Thomas to the lessor, Texaco, would equal .01 cent per gallon for gasoline delivered to the premises by Texaco each calendar month. Texaco characterized the lease agreements as a "wash-out" arrangement which effectively canceled the rental obligations of both parties.

The third document signed by the Thomases was a supply agreement for a term of one year, and thereafter from year to year, terminable by either party on notice. This document set forth the maximum and minimum amount of Texaco products to be sold to and purchased by the Thomases. Each of these agreements were delivered to Mr. Burnes and executed by Texaco some months later.

During the original term of the lease, little money was ever actually exchanged. Texaco merely added the amount of $463.00 to the monthly gasoline delivery invoices paid by Mr. Thomas and would, in turn, send the monthly mortgage payment of $463.00 directly to Industrial National Bank in satisfaction of the mortgage granted to the Thomases. As a part of the original transaction, Texaco guaranteed the initial mortgage, and the Thomases assigned to the bank rent due from Texaco under the lease arrangement.

Before the mortgage issued, the bank required Texaco to make certain improvements on the property. Texaco installed equipment including gasoline storage tanks at a cost of $13,110.00, installation charges included. Texaco also paid $7,500.00 for cement islands, concrete mats and asphalt paving. Texaco further provided stock plans for the design of the service station and assisted in obtaining zoning approval. The underground storage tanks and other Texaco equipment on the property, except for Texaco signs, were sold to Mr. Thomas for $1.00 in 1982.

In 1977, Mr. and Mrs. Thomas were divorced. The property was transferred to Mr. Thomas, and he transferred it to C.L. Enterprises, Inc. (CLE), a corporation of which he is the sole stockholder.

After the original construction, more than $300,000.00 was expended to build three additions onto the original filling station expanding the capacity of the garage and adding an auto body shop. Each of these construction projects were financed with mortgage loans from different banking institutions, and although the title to the property was searched each time a mortgage was granted, at no time did any of the banks raise questions concerning the effect of Texaco's purchase option, which had been recorded in local land evidence records.[1] All costs incurred in connection with these construction projects were paid by Mr. Thomas or CLE.

The first addition was constructed in or about 1972. This addition, at a cost of $90,000.00, expanded the size of the existing building by 1,371 square feet and included three additional garage bays, an office, and a utility room. The second addition was built in 1978 to provide a truck repair bay. This expansion increased the size of the building by 906 square feet. Again, a mortgage in the amount of $90,000.00 was obtained to pay for the cost of the addition and to satisfy the original mortgage.

In 1984 CLE Enterprises, Inc. purchased land which abutted the rear of the original tract. The purchase price for this property was $60,000.00. CLE thereafter obtained zoning approval to construct the third, and largest, addition to the building. Half of this addition lies on the original tract of land subject to the leases, and the other

---

1. The first addition was financed with a mortgage loan from Industrial National Bank. The second addition was financed with a mortgage loan from Citizens Saving Bank, and the third

half was built on the newly acquired abutting parcel. The property line between the original tract subject to the leases and the later acquired abutting property, which is clearly not subject to the option, runs lengthwise and approximately through the middle of the third addition.

The third expansion added 4,563 square feet to the then existing building. The addition provided work space for twelve automobiles, an accounting office and a controller's office. The addition also included, at a cost of $35,000.00, a state of the art painting booth, which was embedded in concrete. A mortgage in the amount of $220,000.00 was obtained to finance this construction.

Texaco knew or ought to have known of all of Mr. Thomas's efforts to expand the original service station. Its representatives were continuously on the scene and it must be concluded that they were completely aware of what was being done and being spent at the site.

On June 15, 1984, Texaco exercised its option to extend the term of the lease agreement for an additional five-year period. A 1982 Lease Expiration Notice indicates that Texaco exercised its option to renew mainly because the purchase option made the "location worthy of renewal." In December, 1984, Texaco assigned all its rights and interest in the Thomas lease to Texaco Refining and Marketing, Inc. (TRMI). TRMI notified the Thomases in January, 1985, of this assignment. On December 31, 1988, TRMI assigned all its rights and interests in the lease agreement to Star. TRMI notified the Thomases of this assignment by letter dated February 10, 1989. Star notified the Thomases in August, 1989, and CLE in November, 1989, of its desire to exercise the purchase option contained in the lease agreement. Star offered to purchase the entire premises, which cost the owner approximately $480,-000.00, for $90,000.00.[2] The Thomases refused to acknowledge Star's right to purchase the leased premises. Star argues

that it is entitled to specific performance of the purchase option contained in the 1968 lease agreement, or in the alternative, damages.

## DISCUSSION

■ Specific performance is an equitable remedy which is vested in the sound discretion of the trial judge. *Parolisi v. Beach Terrace Imp. Ass'n, Inc.*, 463 A.2d 197, 199 (R.I.1983) (citing *Ball v. Milliken*, 31 R.I. 36, 46, 76 A. 789, 794 (1910)). Star's right to specific performance turns on what the nature of the relationship was between Texaco, Star's predecessor in interest, and Thomas at the time of the signing of the lease. The primary issue here is whether the lease agreements were really leases or created an equitable mortgage in Texaco. An equitable mortgage exists where there is a manifestation that real property serve as security for the payment of a debt or obligation. *Tripler v. Campbell*, 22 R.I. 262, 262–64, 47 A. 385, 385–86 (1900); *see also In re Destro*, 675 F.2d 1037, 1039 (9th Cir.1982); *Humble Oil & Refining Co. v. Doerr*, 123 N.J.Super. 530, 551, 303 A.2d 898, 909 (1973).

■ From the very beginning of the negotiations between Texaco and Thomas, Mr. Thomas did not wish to be a tenant of Texaco. Indeed, the fact that he and not Texaco would be the owner of the service station was an essential part of Thomas's plan. Consequently, Mr. Thomas's actions of entering into the lease agreements with Texaco raises two critical questions: (1) How is it explained that the very first action taken by Mr. Thomas was to lease the station, admittedly to be owned by him, to Texaco; and (2) What was the purpose and effect of the lease back arrangement from Texaco to the Thomases? These transactions accomplished nothing except to subject Mr. Thomas to an annual renewal of his lease from Texaco during the 15–year term of Texaco's lease from Thomas

---

addition was financed with a mortgage from Old Colony Cooperative Bank.

**2.** Other expenses incurred by CLE to improve and develop the property include the purchase

and installation of a $50,000.00 computer system and the expenditure of approximately $20,-000.00 to install a new roof, new windows, new lighting, new garage doors, and new dispensers and pump equipment.

and to give Texaco an option to purchase the service station for $90,000.00. The lease agreements obviously were not intended to create a landlord-tenant relationship. Rather, the leases were intended to secure Texaco's interest because of its guarantee of the mortgage granted to the Thomases. There are a number of reasons why this is so.

First, the Texaco Lease Routing Sheet dated October 2, 1968, in two places, makes it abundantly clear what the purpose of the transaction was. It states in the Remarks section, "Please approve as to form, sign, seal, attest and acknowledge. Request prompt handling to enable financing to begin construction immediately." The Routing Sheet further states, "[w]ould appreciate prompt return for his financing!"

Secondly, Texaco had the right to recoup any payments made to the bank under the lease by requiring the Thomases to reimburse it according to the sublease. Moreover, if the Thomases defaulted on the sublease, Texaco had the right to terminate the sublease and take possession of the property. The purchase option also gave Texaco the right to purchase the property outright at anytime during the period of the lease.

Finally, the court accepts as accurate Thomas's testimony concerning the representation by Texaco's representative, Mr. Burnes that "... so long as you're alive and Mrs. Thomas is alive Texaco will never exercise that option." Thomas's testimony is further supported by that of Neil Hermann, a Texaco representative. Mr. Hermann testified that in 1984 he had a conversation with Mr. Thomas regarding the purchase option. It was Mr. Hermann's testimony that during their discussion of the purchase option, Mr. Thomas stated, "Mr. Burnes had told him that ... he shouldn't worry about it."

The veracity of Thomas's testimony is substantially, if not irrebuttably, bolstered by his subsequent actions. It is beyond any sensible belief that, knowing Texaco to have an option to purchase the property at its whim for $90,000.00, Thomas would thereafter invest more than $400,000.00 toward improving the property to Texaco's benefit. If there were ever a situation in which subsequent actions so clearly establish what was said and what was understood, this is that case.

To perceive the lease transactions as simply creating a landlord-tenant relationship is a ridiculous construction of the facts. It is impossible to explain why the parties would participate in leases from and to each other which produced no rent. Further, it is not a matter of coincidence that the lease to Texaco was for fifteen years, the exact term of the mortgage which Texaco had guaranteed, and the monthly rental equaled $463.00, which just happened to be the exact amount of the monthly mortgage payment due from Mr. Thomas to the bank.

■ The conclusion is inescapable that the true purpose and import of the transaction was to assure Texaco protection in the event that Thomas defaulted on the mortgage and Texaco had to satisfy that mortgage. Equity requires that the transaction be treated according to its substance and effect, not its form. *Potter v. United States*, 111 F.Supp. 585, 588 (D.R.I.1953); *Rymanowski v. Rymanowski*, 105 R.I. 89, 100, 249 A.2d 407, 413 (1969); *Doerr*, 123 N.J.Super. at 551, 303 A.2d at 909. In substance and effect, the transaction is in reality a mortgage securing Texaco from loss due to its guarantee of the original Thomas mortgage. Given this conclusion, the purchase option takes on an entirely new meaning. The option must be deemed to be an option to purchase the equity of redemption. Regarded in this fashion, it is a transaction which equity views suspiciously and carefully scrutinizes. 55 Am. Jur.2d *Mortgages* § 1220, at 1001 (1971).

If the purchase option was given as part of a mortgage transaction, it has expired because the original mortgage has long since been satisfied. Satisfaction of an outstanding encumbrance relieves the estate of and extinguishes any obligations under the encumbrance. *Bradford v. Burgess*, 20 R.I. 290, 297, 38 A. 975, 977 (1897). The encumbrance, however, may be kept alive if that is the intent of the parties. *Id.* The facts here clearly establish that Mr. Thomas did not intend to keep the encum-

brance "alive" once the original mortgage had been satisfied. Further, under Rhode Island General Laws, section 34–26–2, Mr. Thomas had a right to a discharge of the original mortgage once that mortgage had been satisfied. *See* R.I.Gen.Laws, section 34–26–2 (1956). Unless otherwise agreed, discharge of the original mortgage also discharges any encumbrances associated with that mortgage. *Bradford,* 20 R.I. at 297, 38 A. at 977. Upon satisfaction of the original mortgage, Mr. Thomas was no longer under any obligation to comply with the purchase option provision contained in the original lease. The original mortgage was indeed satisfied.

 There is an additional reason why specific performance must be denied in these circumstances. "Specific performance will be refused if such relief would be unfair because the relief would cause unreasonable hardship or loss...." Restatement (second) of Contracts § 364(1)(b) (1981); *see also Bochterle v. Saunders,* 36 R.I. 39, 46, 88 A. 803, 806 (1913). Texaco was aware of the improvements which Mr. Thomas made to the premises over the years, yet it steadfastly remained silent. It took no action in 1984 when Mr. Thomas built a building which straddled the property line of the original parcel subject to the lease and an abutting parcel which was not subject to the lease. Texaco had lulled Mr. Thomas into a false sense of security with its promises not to exercise the option at the time of the execution of the leases. An order to transfer title of the property as improved would not only be impossible because of the physical circumstances but is manifestly unfair and inequitable. Recognizing the difficulty associated with a physical separation of the building with its common utilities, Texaco suggests that it should be awarded the current fair market value of the land and buildings which constitute the original parcel. Hence, not only would Mr. Thomas be charged with the cost of constructing the improvements, he would in effect have to pay twice for the improvements. What is subject to specific performance in this circumstance is the promise of Texaco not to exercise the option. And this is the relief the court will provide.

The action will be dismissed with costs to the defendant.