Keven A. McKENNA et al.

v.

Frank J. WILLIAMS et al.

No. 2005–144–M.P.

Supreme Court of Rhode Island.

June 6, 2005.

Keven A. McKenna, Esq., for Plaintiff.

James R. Lee, Esq., Providence, for Defendant.

Present: GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

**Goldberg, Flaherty, and Robinson, Justices, with whom Suttell, Justice, concurs in part, dissents in part, and joins in the judgment.**

This case came before the Supreme Court for oral argument on May 24, 2005, pursuant to an order directing the parties to appear and show cause why the issues raised in the petition for certiorari should not summarily be decided. After hearing the arguments of counsel for the parties and examining their memoranda, we are of the opinion that cause has not been shown and that the issues raised in this petition should be decided at this time.

The petitioners/defendants are Frank J. Williams, the Chief Justice of the Supreme Court, named in his "individual capacity" (Chief Justice Williams), Donald Carcieri, in his capacity as Governor of the State of Rhode Island (Governor Carcieri), Paul Tavares, in his capacity as the Treasurer of the State of Rhode Island (Treasurer Tavares), and Girard R. Visconti, as the Chair of the Rhode Island Judicial Nominating Commission (Visconti or, collectively, defendants). The defendants petitioned this Court for certiorari seeking review of a ruling by the Superior Court that the respondents/plaintiffs, Keven A. McKenna, an attorney appearing *pro se,* and Keven McKenna, P.C., a Rhode Island corporation authorized to practice law in this state (McKenna or plaintiffs), have standing, pursuant to the Uniform Declaratory Judgments Act, G.L.1956 chapter 30 of title 9, to seek a declaratory judgment to the effect that the office of Chief Justice of the Rhode Island Supreme Court is vacant.[1] The complaint also requested a preliminary and permanent injunction re-

---

1. The Court acknowledges a memorandum submitted by *amici curiae,* Salim Ahmed Hamdan, a citizen of Yemen and detainee at Guantanamo Bay, Cuba; Professor Neal Katyal; and Lieutenant Commander Charles Swift.

straining Chief Justice Williams from occupying that office; preliminary and permanent injunctions restraining Governor Carcieri "from not notifying the R.I. Judicial Nominating Commission of the vacancy in the Office of the Chief Justice" and restraining defendant Visconti "from not submitting eligible names of nominees to the office of the Chief Justice of the Supreme Court to the Governor of the State of Rhode Island;" and a preliminary and permanent injunction restraining Treasurer Tavares "from issuing salary checks to [Chief Justice] Williams." For the reasons set forth in this opinion, we grant the petition for certiorari, quash the decision of the Superior Court, and dismiss this case in its entirety.

In their complaint, plaintiffs contend that Chief Justice Williams has vacated his seat on this Court by virtue of his acceptance of an appointment as a member of a Military Review Panel (review panel).[2] The plaintiffs allege that on September 21, 2004, when Chief Justice Williams "was sworn to a federal office as a [m]ember of [a] Military Review Panel of [the] U.S. Department of Defense," the office of Chief Justice was "automatically vacated," pursuant to the provisions of article 3, section 6, of the Rhode Island Constitution. Article 3, section 6, provides, in relevant part, as follows:

"**Holding of offices under other governments—Senators and representatives not to hold other appointed offices under state government.**—No person holding any office under the government of the United States, or of any other state or country, shall act as a general officer or as a member of the general assembly, unless at the time of taking such engagement that person shall have resigned the office under such government; and if any general officer, senator, representative, or judge shall, *after election and engagement,* accept any appointment under any other government, the office under this shall be immediately vacated; but this restriction shall not apply to any person appointed to take deposition or acknowledgement of deeds, or other legal instruments, by the authority of any other state or country." (Emphasis added.)

Additionally, plaintiffs aver that service on the review panel is incompatible with Chief Justice Williams's duties as a member of this Court. McKenna alleges that the Chief Justice "has breached his constitutional contract" with plaintiffs and the other citizens of this state by holding over in violation of article 3, section 6, after his office was vacated.

The plaintiffs contend they have standing to bring this claim because they "have suffered injury in fact as well as being subject to potential injury in fact by the continuing refusal of the [d]efendants to fulfill their statutory and constitutional duties." According to the complaint, plaintiffs "are entitled to have their appellate matters adjudicated only by duly authorized [j]ustices of [this Court]," and they further claim that the "failure to object to the continued seating of [Chief Justice] Williams may be an act of malpractice."

On April 26, 2005, the Presiding Justice of the Superior Court, pursuant to the provisions of G.L.1956 §§ 8-2-4 and 8-2-23, appointed three members of that court "to be a quorum for the purpose of presid-

---

2. The review panel was constituted under Department of Defense, Military Commission Order No. 1 § 6H(4), Mar. 21, 2002, *available at* http://www.defenseli nk.mil/news/Mar2002/ d20020321ord.pdf, and Department of Defense, Military Commission Instruction No. 9, Dec. 26, 2003, *available at* http://www.defenseli nk.mil/news/Jan2004/ d20040108mil-cominstn o9.pdf.

ing over the preliminary motions and trial" of this case. All defendants moved to dismiss pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure for failure to state a claim upon which relief can be granted. The defendants also sought a stay of all proceedings pending a determination by the Superior Court that plaintiffs have the requisite standing to prosecute this claim.

In their memorandum in support of the motion to dismiss, defendants argued that, even if the court accepted all of the factual averments in plaintiffs' complaint as true, drawing all reasonable inferences in plaintiffs' favor, the complaint fails to set forth sufficient facts that would entitle plaintiffs to any relief, and they further argue that plaintiffs lack standing to prosecute this claim.

Additionally, defendants urged that the complaint should be dismissed because Chief Justice Williams was not an elected official, and the provisions of article 3, section 6, prohibiting an officer from accepting any appointment "after election and engagement," are inapplicable to a member of this Court who was appointed by the Governor. It is undisputed that Chief Justice Williams was *appointed to* the Supreme Court by then Governor Almond, in accordance with the 1994 amendments to the state constitution, article 10, sections 4 and 5, which provide, in relevant part:

"**Section 4. State court judges—Judicial selection.**—The governor shall fill any vacancy of any justice of the Rhode Island Supreme Court by nominating, on the basis of merit, a person from a list submitted by an independent non-partisan judicial nominating commission, and by and with the advice and consent of the senate, and by and with the separate advice and consent of the house of representatives, shall appoint said person as a justice of the Rhode Island Supreme Court.

"**Section 5. Tenure of supreme court justices.**—Justices of the supreme court shall hold office during good behavior."

The defendants also argued that article 3, section 6, does not apply to appointments to military positions, because military service "has been a supreme power of the federal government" that was included in the exclusive powers granted to congress in Article I, section 8, of the United States Constitution, which encompasses the power to declare war, to raise and support armies, and to provide and maintain a navy. According to defendants, because a state constitutional provision that might inhibit military service by state officers would conflict with the power of congress to raise an army, the Supremacy Clause of the United States Constitution would render it invalid.[3] The defendants argue that any inhibition against military service by state officials violates the Supremacy Clause.

The issue of the standing of plaintiffs to bring this action was raised and argued by

---

**3.** While the individual states certainly play a very important role in our federal system of government, it is clear that, in the end, national priorities must dominate when the needs of the two sovereignties cannot be harmonized. Indeed, the United States Constitution expresses that principle in what has come to be known as the Supremacy Clause:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding." U.S. Const. Art. VI, cl. 2.

defendants before the Superior Court and in their petition for certiorari. The defendants emphasized the long standing principle that standing is an "access barrier" to the courts. *Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, 452 A.2d 931, 932 (R.I.1982). "Standing is an access barrier that calls for the assessment of one's credentials to bring suit." *Id.* An evaluation of standing should be made before reaching the merits of the claim—particularly, defendants contend, where, as here, "the issue of standing involves the constitutional powers of the general officers" and the subject matter jurisdiction of the Superior Court itself. According to defendants, no matter how it is styled or what plaintiffs aver in subsequent pleadings, "it is undisputed that this action challenges an official's right to hold office." Such a challenge is, at best, a petition in equity in the nature of quo warranto.

In a related vein, defendants have argued that the Superior Court is without subject matter jurisdiction over the issues raised in plaintiffs' complaint. According to defendants, a challenge to the Chief Justice's right to remain in office would, in essence, be an action in quo warranto, which may only be brought in Superior Court by the Attorney General on behalf of the people. *See Whitehouse v. Moran*, 808 A.2d 626, 628 (R.I.2002) ("[B]oth the writ of quo warranto and an information in the nature of quo warranto may be brought only by the Attorney General on behalf of the public to challenge the right of an individual to hold a public office."). A petition in equity in the nature of quo warranto may, in certain limited circumstances, be brought by a private individual—but only in the Supreme Court. *Id.* at 628–29.

On May 11, 2005, a hearing was held in the Superior Court on defendants' motion for a stay of proceedings and on the issue of plaintiffs' standing to bring this action. In response to the concern expressed by the members of the Superior Court panel about the Attorney General's participation as the legal representative of Chief Justice Williams, the attorney for the state declared that the Attorney General had determined that there was no merit to plaintiffs' claim.[4] Although the Superior Court justices were informed that the Attorney General has decided not to undertake a quo warranto action against the Chief Justice and this decision does not vest plaintiffs with standing to bring this claim, after issuing their ruling, the justices declared that they would, at a later date, entertain a motion to disqualify the Attorney General

---

4. At that hearing the Superior Court justices asked the Assistant Attorney General: "[O]n what basis do you represent the [C]hief [J]ustice individually?" Although the attorney for the state disagreed that the Chief Justice was sued in his individual capacity and represented to the court that his office routinely represents judges who are sued by *pro se* litigants and are named individually, officially, or with no designation as to capacity, the panel of justices declared that the role of the Attorney General in this litigation "is a threshold question for us." After the court denied the request for a stay, declared that plaintiffs had standing to maintain this action, and refused to stay their ruling pending a petition for certiorari to this Court, the hearing justices declared that they would entertain plaintiffs' motion to disqualify the Attorney General from representing the Chief Justice in this case. We cannot presently conceive of any circumstances when it would be the role of the Superior Court or this Court to question a constitutional officer's decision to represent or decline to represent a state official who is sued in connection with his or her duties. *See Mottola v. Cirello*, 789 A.2d 421, 425 (R.I.2002) ("It is not the province of this Court, or the Superior Court, to dictate how the Attorney General elects to carry out the statutory functions of his office.").

from representing Chief Justice Williams.[5]

The plaintiffs argued to the panel of justices of the Superior Court that whether the Attorney General could maintain an action in quo warranto was irrelevant to the issues before that court. According to plaintiffs, a Rule 12(b)(6) motion to dismiss is unavailable in the context of the Declaratory Judgments Act because a declaratory judgment merely asks the question and does not concern "the appropriate form of relief." McKenna suggested that although "a lot of judges * * * don't catch the distinction," the only relief plaintiffs were seeking in their declaratory judgment action was a declaration that Chief Justice Williams vacated his office. "It's not the question of the judgment; it's the declaration." According to McKenna, if the court were to declare that the office was vacated, the court would then be faced with determining the appropriate form of relief. Finally, McKenna informed the justices that a Rule 12(b)(6) motion to dismiss was not available in an action for declaratory relief because McKenna was not "asking for relief."

At the conclusion of this argument, the justices took a brief recess, reconvened, and issued the following decision:

"During the past several days and weeks we have read all of counsel[s'] submissions, considered all arguments and otherwise studied these issues. And we are satisfied that we can fairly and properly rule at this time.

"We collectively concur that plaintiffs have standing. [Section] 9–30–1, the Declaratory Judgment[s] Act, provides that the Superior Court, upon petition, shall have power to declare rights, status and other legal relations, whether or not further relief is or could be claimed.

"Further, [§ ] 9–30–12 declares the act to be remedial and to be liberally construed and administered in order to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations.

"Therefore, defendants' emergency motion to stay is denied.

"We are further satisfied that plaintiffs' pleadings and petition have and do reflect all of the traditional hallmarks of requests for declaratory judgments.

"Accordingly, we find that plaintiffs have proper standing to have their claims considered by this panel and discovery may proceed."

The Superior Court made no findings of fact, cited no authority upon which the decision was based, and articulated no analysis, nor did it otherwise mention or refer to the issues raised by defendants.[6]

On May 13, 2005, defendants' petition for certiorari was granted. The defendants argue to this Court that plaintiffs lack the requisite standing to bring this action, that the Superior Court lacks subject matter jurisdiction to adjudicate this

---

**5.** On May 20, 2005, this Court issued an order denying plaintiffs' motion to disqualify the Attorney General from representing any defendant in this case. The suggestion that the Chief Justice was before the Superior Court or is before this Court "in his individual capacity" is simply incorrect. The plaintiffs have filed suit seeking his ouster from office. The allegation that the Chief Justice is sued individually is based on plaintiffs' belief that the Chief Justice *already* has vacated his office. This is the very question that is before

us in this petition, and a challenge to an official's title to office is not a personal matter.

**6.** This Court was informed that an order, agreed upon by the parties, reflecting this decision was submitted for entry. The Court was provided with an unsigned copy of that order. We have since been notified that an order did not enter. We shall proceed on the basis of the bench decision.

claim, and finally, that the provisions of article 3, section 6, of the state constitution are inapplicable to Chief Justice Williams because he was not elected to the Supreme Court.

## Standard of Review

■ The "sole function of a motion to dismiss" pursuant to Rule 12(b)(6) is "to test the sufficiency of the complaint." *Rhode Island Affiliate, ACLU, Inc. v. Bernasconi,* 557 A.2d 1232, 1232 (R.I.1989). When passing upon a Rule 12(b)(6) motion to dismiss, "the trial justice must look no further than the complaint, assume that all allegations in the complaint are true, and resolve any doubts in a plaintiff's favor." *Bernasconi,* 557 A.2d at 1232. If it appears beyond a reasonable doubt that plaintiff would not be entitled to relief, under any facts that could be established, the motion to dismiss should be granted. *Laurence v. Sollitto,* 788 A.2d 455, 456 (R.I.2002).

■ When this Court undertakes a review of a decision granting or denying a Rule 12(b)(6) motion, "we assume that the allegations contained in the complaint are true, and examine the facts in the light most favorable to the nonmoving party." *Estate of Sherman v. Almeida,* 747 A.2d 470, 473 (R.I.2000) (citing *Bandoni v. State,* 715 A.2d 580, 582 n. 3 (R.I.1998)). Consequently, it is our function to examine the complaint to determine if plaintiffs are entitled to relief under any conceivable set of facts. *Id.* This analysis requires our resolution of the overarching issue in this case—whether the Court is confronted with a justiciable controversy. The plaintiffs must have standing to bring this action, and the Superior Court must have subject matter jurisdiction over the issues raised in the complaint.

Finally, we feel compelled, as the state's court of last resort, to determine whether article 3, section 6, of the state constitution is applicable to a justice of this Court who was appointed by the Governor after the 1994 constitutional amendment mandating the selection of justices to this Court by merit. We shall undertake this analysis as the final interpreter of the Rhode Island Constitution and state law. *See Wigginton v. Centracchio,* 787 A.2d 1151, 1154 (R.I.2001) (declaring "[t]his Court is the final arbiter with respect to questions of statutory construction"); *see also Pimental v. Department of Transportation,* 561 A.2d 1348, 1350 (R.I.1989) (explaining this Court is the final interpreter of the state constitution).

## Standing

■ In *Flast v. Cohen,* 392 U.S. 83, 98, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), Chief Justice Warren said: "Standing is an aspect of justiciability and, as such, the problem of standing is surrounded by the same complexities and vagaries that inhere in justiciability." The most fundamental characteristic of standing is that it focuses on the party seeking to have a claim entertained "and not on the issues he [or she] wishes to have adjudicated." *Id.* at 99, 88 S.Ct. 1942. A party seeking relief must have alleged "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Id.* (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). As the Supreme Court said in *Schlesinger v. Reservists Committee To Stop The War,* 418 U.S. 208, 222, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974):

> "To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for

abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.'"

Thus, when standing is at issue, the focal point shifts to the claimant, not the claim, and a court must determine if the plaintiff "whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable" or, indeed, whether or not it should be litigated. *Flast*, 392 U.S. at 99–100, 88 S.Ct. 1942. The result is that courts must sometimes forego deciding issues of public import. *See, e.g., Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 124 S.Ct. 2301, 2311–12, 159 L.Ed.2d 98 (2004) (holding father lacked standing to challenge school district's policy requiring students to say the pledge of allegiance because a custody decree granted mother control over child's up-bringing); *In re Nicholas*, 457 A.2d 1359, 1360 (R.I.1983) (holding grandfather lacked standing to participate in proceedings governing the adoption of or to seek visitation with his natural grandchild).

The test to determine whether a party has the requisite standing was well articulated in *Rhode Island Ophthalmological Society v. Cannon*, 113 R.I. 16, 317 A.2d 124 (1974). The plaintiff must allege to the court's satisfaction that "'the challenged action has caused him injury in fact, economic or otherwise.'" *Id.* at 22, 317 A.2d at 128. This often has been characterized as a legally cognizable and protected interest that is "concrete and particularized * * * and * * * actual or imminent, not 'conjectural' or 'hypothetical.'" *Pontbriand v. Sundlun*, 699 A.2d 856, 862 (R.I.1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In *Pontbriand*, we looked to a corresponding area of our standing jurisprudence and adopted the following statement: "The line is not between a substantial injury and an insubstantial injury. The line is between injury and no injury." *Id.* (quoting *Matunuck Beach Hotel, Inc. v. Sheldon*, 121 R.I. 386, 396, 399 A.2d 489, 494 (1979)).

These venerable principles apply equally to actions at law, in equity, or claims seeking declaratory relief. This Court has consistently declared that the Superior Court is without jurisdiction under the Uniform Declaratory Judgments Act unless it is confronted with an actual justiciable controversy. *Meyer v. City of Newport*, 844 A.2d 148, 151 (R.I.2004); *DeAscentis v. Pine*, 729 A.2d 715, 717 (R.I. 1999). The constituent parts of a justiciable claim include "a plaintiff who has standing to pursue the action" and "some legal hypothesis which will entitle the plaintiff to real and articulable relief." *Meyer*, 844 A.2d at 151. Our review of the complaint in this case compels the conclusion that plaintiffs have failed to meet both elements of justiciability.

Accepting the allegations in the complaint as true, as we must, plaintiffs have alleged that the office of the Chief Justice of the Supreme Court was vacated when Chief Justice Williams undertook an oath to serve on the review panel. Keven A. McKenna is an attorney engaged in the practice of law in this state, and Keven McKenna, P.C., is his incorporated law practice. Neither party has alleged an imminent injury in fact; nor have plaintiffs articulated a stake in the outcome of this controversy that is distinguishable from that of other members of the bar or the public. Our review of the complaint reveals no facts that entitle these plaintiffs to an adjudication of the allegations raised in the complaint. We must reiterate that "[s]tanding is an access

barrier that calls for the assessment of one's credentials to bring suit." *Blackstone Valley Chamber of Commerce,* 452 A.2d at 932. These plaintiffs do not measure up to the requirements of our law—they have neither a stake in the outcome of this controversy nor an entitlement to real and articulable relief.

The Declaratory Judgments Act is a vehicle by which parties can obtain relief for actual or imminent harm. Although McKenna appears to be passionate about some issues of state constitutional law, his subjective enthusiasm does not overcome the glaring jurisdictional deficiencies in this case. Nor are we persuaded that plaintiffs' stated fear of an entirely speculative and hypothetical malpractice claim that might be brought if he did not pursue this action supplies the standing component of justiciability. Unfounded anxiety or a vague fear based on utterly speculative hypotheses is simply not enough. There is nothing in this complaint that clothes these plaintiffs with any "rights, status, [or] other legal relations" to further the act's purpose "to settle and to afford relief from uncertainty and insecurity." Section 9–30–12.

■ We note that McKenna argued to the trial justices that defendants' filing a Rule 12(b)(6) motion in response to his claim under the Declaratory Judgments Act was inappropriate because, according to McKenna, he was "not asking for relief." That proposition is plainly erroneous. In *Lamb v. Perry,* 101 R.I. 538, 225 A.2d 521 (1967), this Court rejected a declaratory judgment action challenging a city ordinance brought by twelve residents of East Providence. We concluded that, as taxpayers and residents, the plaintiffs had "no right, status or other legal relations affected by the amended ordinance, except that which they share[d] in common with all other taxpayers and residents of

the city." *Id.* at 543, 225 A.2d at 524. This Court concluded that the Declaratory Judgments Act was "not intended to serve as a forum for the determination of abstract questions or the rendering of advisory opinions." *Lamb,* 101 R.I. at 542, 225 A.2d at 523. It is fundamental that, to be entitled to a declaratory judgment, a plaintiff must both demonstrate a personal stake in the outcome of the controversy and advance allegations claiming an entitlement to actual and articulable relief. *Meyer,* 844 A.2d at 151. The plaintiffs do not meet this test on either ground.

■ Neither the litigants in our courts nor their lawyers have standing to challenge, on their own, the right of a judge to retain his or her judicial office. *State v. Storms,* 112 R.I. 454, 459–60, 311 A.2d 567, 570–71 (1973). The "title to public office should not be put in question any time an individual sees fit to cast a cloud." *Fargnoli v. Cianci,* 121 R.I. 153, 164 n. 6, 397 A.2d 68, 74 n. 6 (1979). Judge Herrmann of the Superior Court of Delaware accurately summarized this basic principle when he spoke of "the time-honored thesis that usurpation of public office is an offense against the sovereignty of the people and that the proceeding for ousting the offender must be brought by the Attorney General on behalf of the State." *Marshall v. Hill,* 93 A.2d 524, 526 (Del.Super.Ct.1952); *see also, e.g., Brush v. City of Mount Vernon,* 20 N.Y.S.2d 455, 456 (N.Y.Sup.Ct.1940) ("In providing for declaratory judgments it is not to be assumed that the legislature intended to change the law which gives the Attorney General authority to bring an action to determine the title to public office, or to provide another method for that purpose, at least when quo warranto is available."), *aff'd,* 260 A.D. 1048, 24 N.Y.S.2d 355 (App. Div.1940); *Jones v. Talley,* 190 Tenn. 471, 230 S.W.2d 968, 970–71 (1950) ("The De-

claratory Judgment Law does not dispense with the requirement that a suit in the nature of quo warranto proceedings be brought in the name of the State by the District Attorney General."). While we recognize the principle that no one is above the law and that title to public office must sometimes be the subject of legal inquiry, such proceedings are inherently disruptive of the public's business and "must be placed in public and responsible hands." *Fargnoli,* 121 R.I. at 164 n. 6, 397 A.2d at 74 n. 6.

Consequently, McKenna may not maintain this action; he is neither a roving prosecutor nor an Attorney General without portfolio, but a lawyer engaged in the private practice of law in this state. As such, he has no standing to seek the ouster of a public official from office. Our holding as to plaintiffs' lack of standing is consistent with traditional and widely recognized principles in American jurisprudence. *See Ex parte Levitt,* 302 U.S. 633, 633–34, 58 S.Ct. 1, 82 L.Ed. 493 (1937) (holding petitioner lacked standing to challenge Justice Black's appointment to the United States Supreme Court because he had no personal interest different from that in common with the public). The Superior Court erred when it did not grant defendants' motion to dismiss for failure to state a claim upon which relief could be granted.

### Subject Matter Jurisdiction

An action that seeks to challenge the right of a public official to hold office not only involves standing in the traditional sense of requiring a stake in the outcome, but justiciability considerations also arise in this case with respect to the subject matter jurisdiction of the Superior Court. Because an action to test one's title to office is an action in quo warranto and the Superior Court's jurisdiction to entertain the claim is limited, the questions before this Court involve not only the appropriate party but the proper forum. Although this area of the law rarely comes before this Court, our holdings with respect to standing and subject matter jurisdiction have never wavered.

The Superior Court's jurisdiction to entertain an action in quo warranto is strictly limited to actions brought by the Attorney General—the ancient prerogative writ of quo warranto or an information in the nature of quo warranto. *Fargnoli,* 121 R.I. at 162, 397 A.2d at 73. In *Black v. Cummings,* 62 R.I. 361, 362–63, 5 A.2d 858, 859 (1939), this Court was confronted with a petition in equity in the nature of quo warranto, which the Attorney General had declined to bring on behalf of the public. We refused to hear the case on the merits based on our conclusion that the petitioners were seeking to redress "not a private wrong, but a public wrong." *Id.* at 366, 375, 5 A.2d at 860, 864. This Court concluded that the purpose of the petition was to oust the respondents from office, and as such, the proceedings must be instituted in the name of the state. *Id.* at 366, 373, 5 A.2d at 860, 863. There are no exceptions to this rule, because it "would be detrimental to the public welfare and highly inexpedient that title to a public office should be put in question whenever any private citizen sees fit to make the assault." *Id.* at 367, 5 A.2d at 860 (quoting *Jenkins v. Congleton,* 242 Ky. 46, 45 S.W.2d 456, 457 (1932)). The remedy sought is enforcement of a public right and must be brought in the name of the public prosecutor. *Id.* at 367, 5 A.2d at 860–61 (citing *Osgood v. Jones,* 60 N.H. 543, 548 (1881)).

Although, pursuant to § 8–2–16,[7] the Superior Court is vested with concurrent jurisdiction with this Court to hear any proceeding upon a writ of quo warranto or an information in the nature of quo warranto, such claims seek to enforce a public right and the relief it affords is the ouster of the incumbent from office. *Fargnoli*, 121 R.I. at 162, 397 A.2d at 73. Consequently, those claims may only be brought by the Attorney General on behalf of the state; in such proceedings, "the state directs an individual to show by what warrant he [or she] holds public office and [ousts] him [or her] from its enjoyment if the claim is not well founded." *Id.* at 161, 397 A.2d at 72.

A private citizen who questions the right of an incumbent to hold office may employ only a petition in equity in the nature of quo warranto, and jurisdiction over such petitions is exclusively vested in the Supreme Court. *Whitehouse*, 808 A.2d at 628–29. A petition in equity in the nature of quo warranto may be brought by a private individual who asserts that he or she has a right to the office at issue; and pursuant to G.L.1956 § 10–14–1,[8] the Supreme Court has exclusive jurisdiction to entertain such a claim. *Whitehouse*, 808 A.2d at 628–29. "[W]e have repeatedly stressed that a petition in equity in the nature of quo warranto is a statutory proceeding which stands on a completely different basis." *Fargnoli*, 121 R.I. at 162, 397 A.2d at 73. Because this is a legislatively created right, "there is no necessity for the intervention of the [A]ttorney [G]eneral because such a proceeding may be instituted by one who claims title to the office." *Id.*

With these principles in mind, we turn our attention from the party seeking relief to the nature of the claim. The plaintiffs' complaint seeks a declaration that "the Office of Chief Justice * * * [is] vacant" and an injunction permanently restraining Chief Justice Williams "from occupying the Office of Chief Justice of the Rhode Island Supreme Court." Notwithstanding plaintiffs' avowal that this claim was brought pursuant to the Uniform Declaratory Judgments Act and their insistence that the only relief sought is a declaration that the Chief Justice has vacated his office, the entire thrust of the complaint is inconsistent with that position.[9] This is, in actuality, an action challenging the right of a lawfully appointed official to remain in his judicial office.[10] Therefore, it is a petition in equity in the nature of quo warranto, over which the Superior Court has no subject matter jurisdiction.

This Court has consistently rejected claims that sounded in quo warranto but were otherwise disguised. In *Brennan v. Butler*, 22 R.I. 228, 229, 47 A. 320, 320

7. General Laws 1956 § 8–2–16 provides:
 "**Jurisdiction of motions for new trial and extraordinary writs.**—The [S]uperior [C]ourt shall have jurisdiction of such motions for new trials as may be provided by law, and concurrently with the [S]upreme [C]ourt shall have jurisdiction of writs of habeas corpus, mandamus, quo warranto, and informations in the nature of quo warranto."

8. General Laws 1956 § 10–14–1 provides:
 "**Equity petition in [S]upreme [C]ourt.**—The title to any office, to determine which the writ of quo warranto lies at the common law, may be brought in question by petition to the [S]upreme [C]ourt."

9. In reviewing plaintiffs' complaint, we have been guided by the ancient equitable maxim that directs us "to look to the substance rather than the form of the right asserted." *Rymanowski v. Rymanowski*, 105 R.I. 89, 100, 249 A.2d 407, 413 (1969).

10. Very significantly, however, plaintiffs do not claim title to that office.

(1900), we rejected a petition for writ of mandamus to compel the members of the Pawtucket city committee to vacate their offices. Significantly, we held that even if we granted mandamus, "this petition would not of itself oust them from office" and would, therefore, "tend to even greater confusion." *Id.* at 229, 47 A. at 320.

In *Fargnoli,* 121 R.I. at 158, 163, 397 A.2d at 71, 73, we vacated, on jurisdictional grounds, a portion of a judgment entered after a two-day hearing in Superior Court in an action labeled "class action for injunctive relief." We treated that portion of the complaint whereby some of the plaintiffs sought to regain office as a petition in equity in the nature of quo warranto that should have been brought in the Supreme Court. *Id.* at 163, 397 A.2d at 73. With respect to the remaining plaintiffs, who made no individual claim to a particular office, we vacated the judgment, concluding that the claim was in reality a quo warranto writ or an information in the nature of quo warranto that should have been prosecuted by the Attorney General. *Id.*

In *State ex rel. Webb v. Cianci,* 591 A.2d 1193, 1194–95 (R.I.1991), this Court was confronted with a petition for leave to file an information in the nature of quo warranto by a private citizen, seeking to prevent Vincent A. Cianci, Jr. (Cianci), from assuming office as Mayor of Providence.[11] We declined to allow the petition based on our settled jurisprudence that "an information in the nature of quo warranto that seeks to vindicate a *public right* cannot be brought in this jurisdiction without the intervention of the Attorney General." *Id.* at 1197.

In *Storms,* 112 R.I. at 460, 311 A.2d at 570–71, we ruled that defendants in a crim-

inal case did not have standing to dispute the election to this Court of the late Justice John Doris, concluding that such actions must be brought by the Attorney General on behalf of the public.

Accordingly, when confronted with a challenge to a public official's title to office, it is incumbent upon this Court to conduct an examination of the credentials of the person bringing the claim and the forum in which it is instituted. These overlapping principles obtain because of the nature of the action, its historical underpinnings, the significant interest of the official whose title to office is questioned, and the important interest of the public in the efficient performance of its governmental business.

■ Therefore, we hold that this action cannot be maintained in the Superior Court without the intervention of the Attorney General. Furthermore, because neither plaintiff is claiming a right to the office of Chief Justice, a petition in equity in the nature of quo warranto does not lie in the Supreme Court.

■ Although the foregoing holdings are determinative of the issues before this Court, we are mindful of the public importance that attaches to such a direct challenge to an official's title to office. We, therefore, feel compelled to go further and to address the merits. A review of our quo warranto jurisprudence discloses our willingness to address so much of the merits of a controversy as we deem necessary in order to put the underlying issue to rest. *See State ex rel. Webb,* 591 A.2d at 1201 (Although refusing to consider an information in the nature of quo warranto filed by a private individual and denying common law writ of certiorari to review

11. A companion petition for writ of certiorari to review a decision of the State Board of Elections that had certified respondent Cian-ci's election was also before this Court. *State ex rel. Webb v. Cianci,* 591 A.2d 1193, 1196 (R.I.1991).

State Board of Elections' decision to certify Cianci's election, this Court could nonetheless address constitutional issues relative to a convicted felon's right to hold office.); *In re Advisory Opinion (Chief Justice)*, 507 A.2d 1316, 1319 (R.I.1986) (Despite obvious procedural deficiencies in an advisory question from the governor and both houses of the General Assembly, this Court nonetheless addressed "the profoundly important substantive issues raised by the petitioners' request."); *Fargnoli*, 121 R.I. at 163, 397 A.2d at 73 (In light of "the public demand that Providence's municipal paralysis" be resolved, this Court fashioned its own writ and considered some claims as a petition in equity in the nature of quo warranto.); *Davis v. Hawksley*, 119 R.I. 453, 455, 379 A.2d 922, 923 (1977) (Although the Superior Court failed to address the absence of subject matter jurisdiction to entertain a challenge to a judge's title to office, this Court decided the controversy on the merits.); *Storms*, 112 R.I. at 460, 311 A.2d at 570–71 (This Court dismissed defendant's claim on jurisdictional grounds, noting the absence of any serious questions with respect to the validity of the election and qualification of Justice Doris.). Our decision to address the substance of plaintiffs' contentions in this case is based on the public importance of the constitutional issues presented in this certiorari petition.[12]

### Article 3, Section 6, and Article 10, Section 4

This Court has previously declared that the prohibition against holding office under another government contained in article 3, section 6, of the state constitution was intended "to secure the undivided loyalty and service of such officers to this state." *Opinion to the Governor*, 83 R.I. 370, 373, 116 A.2d 474, 475 (1955). This concern was addressed by the framers of the state constitution in two ways:

"In the first clause of [section 6] they provided that no person while holding an office under any other government, state or country could act as a general officer or as a member of the general assembly. Apparently not content with this exclusion[,] they then provided in the second clause that if any such officer or judge, after his [or her] election and engagement, accepted *any appointment* under any other government then his [or her] office shall be immediately vacated." *Id.*

As noted, this case concerns the second clause of article 3, section 6—whether, in the context of this case, as an appointed (and not elected) member of this Court, Chief Justice Williams falls within its provisions. During oral argument before this Court, the Assistant Attorney General represented that the Attorney General, in the exercise of his constitutional authority, had determined, after a diligent review of the state constitution and this Court's jurisprudence, that the 1994 amendments to article 10, sections 4 and 5, are conclusive—that, as a result of these amendments, article 3, section 6, no longer applies to the present justices of this Court, who are not elected and engaged.[13] We

---

12. We note that, although seeking a different result in this case, the *amici curiae* urge our resolution of this important question of state constitutional law, arguing that "for reasons of equity and judicial efficiency, [this Court] should follow precedent and exercise its jurisdiction," because an adjudication of this constitutional question by this Court is inevitable. We agree.

13. We accept this representation as conclusive with respect to the Attorney General's discretionary decision to decline to bring an action in quo warranto against this public officer.

agree; and we are mindful that, in reaching this issue, we do not write on a clean slate.

 In considering the language of article 3, section 6—as we would with respect to any other constitutional provision—"we follow the well-established rule of construction that words in a constitution are to be given their usually accepted meaning." *Davis*, 119 R.I. at 455, 379 A.2d at 923. "Unless a contrary intent clearly appears on the face of the provision, absent equivocal or ambiguous language, the words cannot be interpreted or extended but must be applied literally." *Id.* This Court has repeatedly emphasized that the plain language of a statute (when it is unambiguous and does not lead to an absurd result) makes inquiry into the intent of the legislators unnecessary. *See, e.g., State v. Santos*, 870 A.2d 1029, 1032 (R.I.2005) ("The plain statutory language is the best indicator of legislative intent."); *Little v. Conflict of Interest Commission of Rhode Island*, 121 R.I. 232, 237, 397 A.2d 884, 887 (1979) ("It is a primary canon of statutory construction that statutory intent is to be found in the words of a statute, if they are free from ambiguity and express a reasonable meaning.").[14] Constitutions, just like statutes, have an effect *by what they say.* When a constitutional provision is clear, it speaks for itself. In the face of a clear constitutional provision (assuming it does not lead to absurd results), it is not necessary to anguish over what might have been the intent of the electorate. *See, e.g., Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms."); *Santos*, 870 A.2d at 1032; *see also Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.*, 545 F.2d 754, 756 (1st Cir.1976).

 Ascribing customary meaning to its words, we are constrained to conclude that article 3, section 6, no longer applies to the justices of this Court because we are no longer elected to our positions. We are satisfied that, by its clear language, article 3, section 6, is restricted to those enumerated state officials who, "after *election and engagement*, accept any appointment under any other government * * *." (Emphasis added.)

From the time the state constitution became effective, in 1843, until November 8, 1994, when article 10, section 4, was amended by a majority of those who voted in a statewide election, the justices of the Supreme Court were elected to their positions.[15] The contrast between the former election provision and the current appoint-

---

**14.** In the classic Sutherland treatise, *Statutes and Statutory Construction*, the following statement appears at § 67:9: "Courts are cautious when inquiring about legislative motive or purpose and recognize that what motivates one legislator to make a comment about a law is not necessarily what motivates fellow legislators to enact the law." 3A Norman J. Singer, *Sutherland on Statutes and Statutory Construction* § 67:9 at 168 (6th ed.2003). In our judgment, the principle enunciated in the Sutherland treatise applies with equal force to the motives of voters in a general election when they pass upon a proposed constitutional amendment. What matters in the end is what the amendment says.

**15.** Until the 1994 amendment became effective, the justices of this Court were elected by the General Assembly sitting in grand committee. But the modality of their election is irrelevant. What is significant is that they were *elected*, whereas, now, justices of this Court are *appointed.*

ment provision of the state constitution is determinative of the issue before this Court.

In *Opinion to the Governor (The Election of Justices of the Supreme Court)*, 23 R.I. 635, 641, 51 A. 221, 223 (1902), we observed that the election referenced in article 10, section 4, was "an election by the General Assembly[,] not the election by the people." It was clearly understood that the justices of this Court were elected officers. Prior to the 1994 amendment, article 10, sections 4 and 5, provided:

"Section 4. Judges of supreme court—Election—Term of office.— The judges of the supreme court shall be elected by the two houses in grand committee. Each judge shall hold office until that judge's place be declared vacant by a resolution of the general assembly to that effect; which resolution shall be voted for by a majority of all the members elected to the house in which it may originate, and be concurred in by the same majority of the other house. Such resolution shall not be entertained at any other than the annual session for the election of public officers; and in default of the passage thereof at said session, the judge shall hold that place as is herein provided.

"Section 5. Judges of supreme court—Filling of vacancies.—In case of vacancy by death, resignation, removal from the state or from office, refusal or inability to serve, of any judge of the supreme court, the office may be filled by the grand committee, until the next election, and the judge then elected shall hold office as before provided. In case of impeachment, or temporary absence, or inability, the governor may appoint a person to discharge the duties of the office during the vacancy caused thereby."

In 1902, in the context of a question from the governor, this Court was asked to pass upon the state constitutional provisions that related to the election of judges in grand committee. *Opinion to the Governor*, 23 R.I. at 636, 51 A. at 221. We noted that article 10, section 4, set forth "what may be called the normal term of office of the judges of the Supreme Court, which is from the time of election and qualification until death, resignation, or removal by vote of the two houses or by impeachment." *Opinion to the Governor*, 23 R.I. at 637, 51 A. at 221. In addressing section 5 of article 10, however, we noted that this provision provided "for a shorter term in cases of vacancy arising from certain causes," which, we held, was from the time of election by the grand committee at a session other than "the annual session for the election of public officers" until the next such annual election. *Opinion to the Governor*, 23 R.I. at 637, 51 A. at 221. The justice who was elected (or re-elected) "at the annual election shall hold his office for the normal term," which we deemed to be during good behavior, unless the justice was impeached or his seat was declared vacant by the General Assembly. *Id.* In reaching this determination, we looked to the words of the late Chief Justice Ames, in the landmark opinion, *G. & D. Taylor & Co. v. Place*, 4 R.I. 324 (1856).

"To meet the new exigency the judges of the Supreme Court, who under the charter had, like all other officers, been of annual appointment by the general assembly, were endowed with a firmer tenure—that of good behavior—unless removed by the joint vote in separate houses, of a majority of those elected to the general assembly in each, passed at the May Session, when the members came to the assembly fresh from the people, and before legislative factions could have time to be formed, or to grow unscrupulous in their action against the

judges." *Opinion to the Governor*, 23 R.I. at 640, 51 A. at 222 (quoting *Taylor*, 4 R.I. at 352).

Chief Justice Ames declared that when the people adopted the state constitution, they "desired to have, in their court of last resort, * * * an educated and independent judiciary, with a comparatively stable tenure of office." *Taylor*, 4 R.I. at 353. Subsequent amendments to the state constitution resulted in an abandonment of the annual session for the election of public officers. This evolution in our constitutional history greatly impacted the tenure of the justices of this Court. However, as significant as these constitutional amendments were, they are overshadowed by the 1994 amendments to article 10, sections 4 and 5.

In 1985, a question was propounded by the Governor and both houses of the General Assembly, relative to the tenure of then Chief Justice Bevilacqua. *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1317–18. In that case, the justices of this Court were called upon to determine under what circumstances the Chief Justice's position could be declared vacant in accordance with the removal provision of article 10, section 4, which provided:

"Each judge shall hold office *until that judge's place be declared vacant by a resolution of the general assembly to that effect; * * *. Such resolution shall not be entertained at any other than the annual session for the election of public officers * * *.*" (Emphases added.)

Because the authority of the General Assembly to declare vacant a judge's seat on this Court, in accordance with article 10, section 4, was limited "to that day upon which 'the annual session for the election of public officers' took place," it was the opinion of a majority of justices of this Court that, in light of subsequent constitutional amendments, that "session has been eradicated and because of its demise the power to remove [judges] has been extinguished." *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1320.[16]

"Our constitutional development involving the structure and operations of state government reflected this evolution. In particular, the constitutional framework establishing the timing and location of General Assembly sessions and the method by which public officers would be elected has been the subject of substantial amendment." *Id.* at 1321.

These structural changes to the state constitution led us to conclude that the General Assembly's power to declare a

---

**16.** Article 4, section 3, was superseded by article 3 of the amendments, providing for one session of the General Assembly, " 'holden annually, commencing on the last Tuesday in May, at Newport, and an adjournment from the same shall be holden annually at Providence.' " *In re Advisory Opinion (Chief Justice)*, 507 A.2d 1316, 1321–22 (R.I.1986). Article 3 was superseded in 1893 by article 11 of the amendments, providing for one session of the General Assembly, commencing on the first Tuesday in January of each year, in Providence. *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1322.
Article 10 was also enacted in 1893 and provided that all elections in the state should be by plurality and not majority, thus divesting the General Assembly "of its former constitutional duty to hold elections in grand committee for the purpose of choosing between the two highest vote getters in an election in which neither had" secured a majority of votes. *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1322.
In 1900, article 11, section 2, of the amendments changed the time for the general election to the Tuesday after the first Monday in November, and in 1912, article 16, section 1, of the amendments provided for biennial elections. *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1322.

seat on the Supreme Court vacant had been abolished.

We looked to the language of the constitution, "with all the lights and aids of contemporary history." *Id.* at 1322 (quoting *Prigg v. Pennsylvania*, 41 U.S. (16 Pet.) 539, 609 (1842)). Our review disclosed that, in 1843, when the constitution became effective, " 'the annual session for the election of public officers' " was the date on which the General Assembly met in grand committee for the purpose of filling vacant seats in the Legislature or the ranks of the general officers. *Id.* at 1321. All general officers and senators and representatives were elected by popular election on an annual basis and, to be successful, a candidate needed a majority of the popular votes cast for that office. *Id.* Failing that, the seat would be filled "by the grand committee at the May session convened 'for the purpose of election and other business,' " as prescribed by article 4, section 3. *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1321. However, a majority of the justices concluded that " 'the annual session for the election of public officers' " was "consigned to history" and, with it, the removal power of the General Assembly as set forth in article 10, section 4, of the constitution. *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1322.

Likewise, our review of the 1994 amendments to article 10, sections 4 and 5, leads us to the inescapable conclusion that, as appointed justices to the Supreme Court, the prohibition against dual office holding in article 3, section 6, no longer applies to the members of this Court. The older constitutional provision, article 3, section 6, is directed to a class of citizens, *viz.*, those general officers, senators, representatives, and judges, who have been elected and engaged. The more recent constitutional provision, article 10, section 4, subtracts certain members from that class. The former provision is not *repealed* by the latter; it is simply rendered inapplicable to those whom the more recent amendment has removed from the class.[17]

The late Justice Kelleher's dissent in *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1330–33, is instructive on the issues we face today. Justice Kelleher noted the "centuries of complete indifference on the part of the Rhode Island electorate to affording any degree of job security to the members of this [C]ourt." *Id.* at 1332 (Kelleher, J., dissenting). Justice Kelleher noted that "[d]espite a constitutional distribution of power of government among the legislative, executive, and judicial departments," the Legislature was disinclined to divest itself of the plenary power "it had exercised for so long over the judicial department." *Id.* at 1330. According to the dissent, clashes between the three branches of government were inevitable, culminating in a series of decisions, including *Taylor*, which declared that the Supreme Court was made "the ultimate state tribunal," under the constitution, vested with

---

17. It is possible to construe the two amendments in harmony. *See District of Columbia Metropolitan Police Department v. Perry*, 638 A.2d 1138, 1144 (D.C.App.1994) ("[E]ven if there is a positive repugnancy between the old and the new statutes such that they are irreconcilable, the older statute is repealed only to the extent of the irreconcilability."); *see also United States v. Tynen*, 78 U.S. (11 Wall.) 88, 92, 20 L.Ed. 153 (1870) (stating the principle that, if two statutes "are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first"); *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 703 (1st Cir.1994). We agree with the reasoning of the court in *Perry*, 638 A.2d at 1144, that "the process of reconciliation involves retaining the whole of the newer and more specific statute and retaining as much of the older and more general statute as is reasonably possible."

"the whole judicial power of the state" and "in such inferior tribunals as the general assembly might set up." *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1331 (Kelleher J., dissenting) (quoting *Taylor*, 4 R.I. at 353). Nonetheless, although vested with " 'the whole judicial power,' " the members of this Court were subject to the General Assembly's power to declare their places vacant. *Id.*

In rejecting the majority's finding of a repeal of article 10, section 4's power to declare a seat on this Court vacant, Justice Kelleher opined that a repeal of a constitutional provision "will be countenanced and preference given the last enactment only if the enactments in question are so irreconcilably repugnant to each other that the two enactments cannot stand together." *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1333 (Kelleher, J., dissenting) (citing *State v. Souza*, 456 A.2d 775, 781 (R.I.1983)). This principle is at the heart of the issue before us.

The current structure of our state government, including how vacancies on this Court are filled, is vastly different from that found in the constitution that became effective in 1843. On November 8, 1994, the electorate set aside centuries of "complete indifference" to the qualifications, selection, and appointment of the justices of this Court. Supreme Court justices are no longer elected, nor are we subject to removal by the Legislature, except by impeachment. Since November 1994, the justices of this Court have been appointed by the governor on the basis of merit, with the advice and consent of both houses of the General Assembly. We serve during good behavior.

■ As we noted in 1999, in *In re Advisory Opinion to the Governor (Rhode Island Ethics Commission—Separation of Powers)*, 732 A.2d 55, 70 (R.I.1999), the structure of our government is inherently a constitutional question, the resolution of which is reserved for this Court. The drafters of the 1994 amendments to article 10 are presumed to have been aware of and to have considered the effects of those amendments on the applicability of article 3, section 6, to the members of this Court. Because Supreme Court justices no longer arrive here by way of election and engagement, section 6 of article 3 does not apply to the members of this Court. Accordingly, we hold that the prohibition against accepting such appointments, "after election and engagement" (to the extent this section even relates to a military commission, *see infra*) is limited to elected officials and, therefore, may not properly be invoked with respect to the Chief Justice's service on a review panel.

### The Supremacy Clause and Article 3, Section 6

■ Even if this Court were to agree with McKenna's assertion that Chief Justice Williams's appointment to the review panel violates the terms of article 3, section 6, of the Rhode Island Constitution, which we do not, such an interpretation would, in our view, run afoul of the United States Constitution. To begin, we note that courts in several states which prohibit dual office holding in their constitutions have specifically held that military service does not fall within the ambit of constitutional proscription.[18] In a 1943 opinion of

---

18. In all candor, we also note that some jurisdictions have, in fact, prohibited state officers from accepting roles in the United States military without suffering the detriment established by their state constitutions and statutes.

*See State ex rel. Cooper v. Roth,* 140 Ohio St. 377, 44 N.E.2d 456, 459 (1942) (city councilman's military service constituted prohibited engagement in other public employment and automatically brought about forfeiture of his

the California Supreme Court interpreting the applicability of a state constitutional provision prohibiting dual state and federal office holding to a state judge who had been commissioned as a captain in the United States Army, the Court reasoned that:

> "It was never the intent or purpose of article IV, section 20, of the Constitution of this state to discourage public employees from rendering military or naval service, to deter them from answering, or induce them to evade such a call, or to tend to impede the federal government in its effort to mobilize the citizenry * * *. The constitutional provision can neither be construed nor applied to effect such a result." *People v. Sischo,* 23 Cal.2d 478, 144 P.2d 785, 788 (1943) (quoting *McCoy v. Board of Supervisors,* 18 Cal.2d 193, 114 P.2d 569, 571 (1941)).

We take note of the California Supreme Court's refusal to interpret its constitution in a way that would prove a disservice to both our nation and the men and women who are called to serve on its behalf during times of national need. *See Kennedy v. Cook,* 285 Ky. 9, 146 S.W.2d 56, 57, 58 (1940) (a circuit clerk who retained his commission as captain in the National Guard did not forfeit state office on grounds of holding incompatible offices); *State ex rel. McGaughey v. Grayston,* 349 Mo. 700, 163 S.W.2d 335, 341 (1942) (en banc) (Missouri constitutional provision did not mandate vacation of judicial position as a result of military service. "Every citizen, the untrained as well as the trained, owes to his government the duty to render military service in time of need. In order to survive it is necessarily the policy of the

State law to aid, not impede our common defense."); *Critchlow v. Monson,* 102 Utah 378, 131 P.2d 794, 799 (1942) (Utah Supreme Court justice did not automatically forfeit his office by accepting a commission in the army. Constitutional provision prohibiting dual office holding "has no reference to those who are called to military duty.").

■ It seems to us that the framers did not intend for the Rhode Island Constitution to interfere with our citizens' willingness to render service to their nation; to do so may fly in the face of the Supremacy Clause of the United States Constitution. Article VI of the United States Constitution provides that the Constitution and the laws of the United States "shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding." Thus, state constitutional and statutory law is subordinate to the constitutional powers of the federal government, and "the Constitution and the laws passed pursuant to it are the supreme laws of the land, binding alike upon states, courts, and the people * * *." *Testa v. Katt,* 330 U.S. 386, 391, 392, 67 S.Ct. 810, 91 L.Ed. 967 (1947) (holding that the state of Rhode Island had no right to deny enforcement to claims arising out of a valid federal law). Under Article II, section 2, of the United States Constitution, the President is the commander in chief of the army and navy, and "shall appoint ambassadors, other public ministers and consuls, judges of the supreme court, and all other officers of the United States, whose appointments are not herein otherwise provided for * * *."

office); *Commonwealth ex rel. Crow v. Smith,* 343 Pa. 446, 23 A.2d 440, 442 (1942) (pursuant to constitutional provision prohibiting state officers from holding federal positions, Uniontown mayor vacated position upon

commission as a major in the United States Army). We respectfully disagree with those holdings as being inconsistent with our understanding of the role of the states in our federal system.

Further, the power to raise and support armies lies in Congress's hands. U.S. Const. Art. I, sec. 8. Therefore, any Rhode Island constitutional provision or statute that interferes with these federal powers would not withstand constitutional scrutiny.

Any interpretation of article 3, section 6, of the Rhode Island Constitution that prohibits a judge from serving the United States Department of Defense in this capacity without forfeiting his state office would result in a clash between federal and state law. The United States Supreme Court has spoken on this issue. *See generally Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

"This Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula. *Our primary function is to determine whether, under the circumstances of this particular case, [the law in question] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.*" *Id.* at 67, 61 S.Ct. 399. (Emphasis added.) *See also Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); *accord American Insurance Association v. Garamendi*, 539 U.S. 396, 421, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) ("The exercise of the federal executive authority means that state law must give way where * * * there is evidence of clear

conflict between the policies adopted by the two.").

Can we require state officials to choose between their livelihood and service to their nation? Can we interpret our state constitution as forcing an official to abandon his or her career when answering the call of duty? Can the Rhode Island Constitution stand as even the slightest obstacle to the maintaining of the military as the federal government sees fit? In our opinion, it cannot. Even if our state constitution were to be interpreted as prohibiting dual office holding under all circumstances, we must still recognize that "whatever power a state may have is subordinate to supreme national law." *Hines*, 312 U.S. at 68, 61 S.Ct. 399. Therefore, when applying article 3, section 6, of the Rhode Island Constitution to our Chief Justice and his service on the Military Review Panel, we must consider that the President has exercised his authority as commander in chief in appointing Chief Justice Williams to this position. The interpretation McKenna urges upon us would most certainly stand as an obstacle to the accomplishment of constitutionally ordained objectives of the federal government.

## Conclusion

In conclusion, for the reasons set forth herein, we hold that the plaintiffs have no standing to prosecute this claim and that this claim can only be brought as an action in quo warranto by the Attorney General. As such, the Superior Court lacks subject matter jurisdiction to entertain a petition for writ of quo warranto or an information in the nature of quo warranto unless such petition or information is filed by the Attorney General. Further, we are of the opinion that the provisions of article 3, section 6, of the Constitution of Rhode Island do not apply to the appointed members of this Court. Finally, we wish to

indicate our conviction that the Chief Justice accepted this position with the purest of motives and out of a patriotic spirit of long duration. We are satisfied that this limited and temporary service in a judicial capacity associated with our nation's anti-terrorism efforts will in no way conflict with his duties as Chief Justice of the Rhode Island Supreme Court. Accordingly, the decision of the Superior Court is quashed, and the case is dismissed in its entirety.

Chief Justice WILLIAMS did not participate.

SUTTELL, Justice, concurring in part and dissenting in part.

I am wholly in agreement with the majority opinion with respect to its analysis of the issues of standing and subject-matter jurisdiction. As these issues are dispositive of the plaintiffs' complaint, I concur with the opinion's holding to dismiss the case in its entirety.

Although an argument can be made that, in light of the significant public interest in having the ultimate matter resolved, this Court should overlook the procedural and jurisdictional deficiencies of the complaint and allow plaintiffs to proceed, I do not share this view. As the majority aptly points out, the right at issue here, *i.e.,* the right to contest a public officer's title to office, is a public right, the contours of which have been clearly delineated by prior case law in this and other jurisdictions. Moreover, principles long established by this Court have carefully circumscribed the exercise of the Court's discretion to allow private parties to maintain such suits. As this Court expounded in *State ex rel. Webb v. Cianci,* 591 A.2d 1193 (R.I. 1991):

"These early decisions demonstrate that we have continuously exercised our discretion to hold that an information in the nature of quo warranto that seeks to vindicate a *public right* cannot be brought in this jurisdiction without the intervention of the Attorney General. * * * The purpose of this rule is to protect public officials from numerous private challenges to their titles as public officers." *Id.* at 1197.

This Court has also said that "title to public office should not be put in question any time an individual sees fit to cast a cloud. Proceedings by way of quo warranto or informations in the nature of quo warranto must be placed in public and responsible hands. The moving party on such occasions is the attorney general." *Fargnoli v. Cianci,* 121 R.I. 153, 164 n. 6, 397 A.2d 68, 74 n. 6 (1979).

In his dissenting opinion in *Webb,* Chief Justice Fay lamented that the Court's holding "effectively abolished the discretionary ability this court has possessed for over a century to grant standing in such circumstances." *State ex. rel. Webb,* 591 A.2d at 1208. While I do not believe that this Court can ever "abolish" its inherent or prerogative authority, there can be no question that prior case law has attempted to sharply curtail the Court's discretion in this area. Nor do I believe that the present case presents such a rare occasion that warrants a deviation from this time-honored rule.

Here, the Attorney General, a constitutional officer sworn to "support the Constitution of this state," R.I. Const. art. 3, sec. 3, has represented to this Court that he has "carefully examined the matters that form the basis of this complaint" and that "[a]fter a due and diligent review of this matter and this Court's decisions the At-

torney General determined there was no basis to bring a quo warranto action against the lawfully appointed and lawfully sitting Chief Justice at this time or any other time for the acts asserted herein."

Moreover, the Governor is a defendant in this case and, through counsel, has appeared in these proceedings. Pursuant to article 10, section 4 of the Rhode Island Constitution, the Governor is entrusted with the constitutional authority to "fill any vacancy of any justice of the Rhode Island Supreme Court," and the statutory obligation to "immediately notify the commission of any vacancy or prospective vacancy of a justice of the Rhode Island [S]upreme [C]ourt." G.L.1956 § 8–16.1–5(a). Thus, if the Governor concluded that, as plaintiffs argue, the office of Chief Justice had already been vacated, he would have the obligation to initiate the judicial selection process. Not only has he declined to do so, he has joined in the petition seeking the dismissal of plaintiffs' complaint.

While neither the Attorney General nor the Governor are final arbiters of our Constitution, we need not abandon well-settled principles of justiciability even though plaintiffs have raised a constitutional challenge. Here, at least two constitutional officers, after reviewing the allegations, assert that there is no constitutional infirmity with Chief Justice Williams' title to the office of Chief Justice of the Supreme Court. Under the circumstances, I believe that the public right at issue here has been adequately safeguarded, and that this is not an occasion when this Court should, in contravention of its long-established jurisprudence, allow a private citizen to vindicate a public right.

In light of the foregoing reasons, I am in accord with the majority's judgment dismissing plaintiffs' complaint. In the circumstances of this case, therefore, the Court need proceed no further. As the majority has addressed the merits of plaintiffs' claims, however, I write separately to comment briefly on the underlying issues. I also join in that portion of the majority opinion that discusses the interrelationship of the Constitutions of the United States and Rhode Island, and the transcendency of the Supremacy Clause. Further, it is not at all clear to me that military service in general, or service on the Military Review Panel at issue here, violates the Rhode Island Constitution's prohibition against accepting an "appointment under any other government." I respectfully disagree, however, with the majority's conclusion that the provisions of article 3, section 6 no longer apply to judges. Rather, I believe that, consistent with well-established principles of statutory construction, the provisions of article 10, section 4 and article 3, section 6 may be read harmoniously, such that the intended purpose of both may be fairly secured.

In *Prigg v. Pennsylvania,* 41 U.S. (16 Pet.) 539, 10 L.Ed. 1060 (1842), when faced with interpreting two constitutional provisions which stood in "juxtaposition with each other," *id.* at 611, Mr. Justice Story, writing for the Court, stated:

"How, then, are we to interpret the language of the clause? The true answer is, in such a manner, as, consistently with the words, shall fully and completely effectuate the whole objects of it. If by one mode of interpretation the right must become shadowy and unsubstantial, and without any remedial power adequate to the end; and by another mode it will attain its just end and secure its manifest purpose; it would seem, upon principles of reasoning, absolutely irresistible, that the latter ought to prevail. No Court of justice can be authorized so to construe any clause of the Constitution as to defeat its obvious

ends, when another construction, equally accordant with the words and sense thereof, will enforce and protect them." *Id.* at 612.

Article 3, section 6, provides that if "any general officer, senator, representative, or judge shall, after election and engagement, accept any appointment under any other government, the office under this shall be immediately vacated." From the time the state constitution was ratified in 1843, until November 8, 1994, when article 10, section 4 was amended by a majority of the electorate voting in a statewide election, the justices of the Supreme Court were "elected by the two houses in grand committee." On November 8, 1994, the Rhode Island electorate amended the state constitution to provide that the Governor would select individuals for judicial positions from a list compiled by a judicial nominating commission. As approved by the voters, article 10, section 4 directs that:

> "The governor shall fill any vacancy of any justice of the Rhode Island Supreme Court by nominating, on the basis of merit, a person from a list submitted by an independent non-partisan judicial nominating commission, and by and with the advice and consent of the senate, and by and with the separate advice and consent of the house of representatives, shall appoint said person as a justice of the Rhode Island Supreme Court. * * * The powers, duties, and composition of the judicial nominating commission shall be defined by statute."

This Court has said that "under the 1994 amendment, the selection process has been formally altered to reduce the role of the Legislature, to expand the role of the Governor, and to require that the [judicial nominating] commission specify three to five candidates 'on the basis of merit.' " *In re Advisory to the Governor (Judicial Nominating Commission* ), 668 A.2d 1246, 1249 (R.I.1996).

There is a fundamental and structural difference between a system whereby "[t]he judges of the supreme court shall be elected by the two houses in grand committee," article 10, section 4 prior to the 1994 Amendment, and the merit-based selection process that now obtains. Contrary to plaintiffs' assertion, the 1994 Amendment did more than "only change[ ] the **sequence** by which the General Assembly elected judges." The role of the Senate and House of Representatives in giving advice and consent simply cannot be equated with electing judges in Grand Committee. Did the 1994 amendment, however, also place judges beyond the scope of the article 3, section 6 prohibitions against accepting "any appointment under any other government"?

It is clear that the 1994 amendment to article 10, section 4 makes no reference whatsoever to article 3, section 6. Therefore, any effect upon the latter provision must be by necessary implication. It is also a well-established rule of statutory, or constitutional, construction that

> "repeals by implication are not favored by the law. When the repealing effect of a statute is doubtful, the statute will be strictly construed to effectuate its consistent operation with previous legislation. * * * Sutherland, *Statutes and Statutory Construction* § 23.10, at 230–31 (C. Sands 4th ed.1972). Only when the two statutory provisions are *irreconcilably repugnant* will a repeal be implied and the last-enacted statute be preferred. * * * We have also stated that if two statutes are found not to be inconsistent with one another and relate to the same subject matter, they are deemed 'in *pari materia* and should be considered together so that they will harmonize with each other and be con-

sistent with their general object and scope, even though they contain no reference to one another and were passed at different times.'" *Berthiaume v. School Committee of Woonsocket*, 121 R.I. 243, 248–49, 397 A.2d 889, 893 (1979). (Emphasis added.)

Moreover,

"courts should attempt to construe two statutes that are in apparent conflict so that, if at all reasonably possible, both * * * may stand and be operative." *Shelter Harbor Fire District v. Vacca*, 835 A.2d 446, 449 (R.I.2003) (quoting *Providence Electric Co. v. Donatelli Building Co.*, 116 R.I. 340, 344, 356 A.2d 483, 486 (1976)).

Our touchstone throughout this task is to "give effect to the intent of the framers." *City of Pawtucket v. Sundlun*, 662 A.2d 40, 45 (R.I.1995). We have previously elucidated on the intent of both of these provisions. In *In re Advisory to the Governor (Judicial Nominating Commission)*, 668 A.2d at 1249, four justices of this Court opined that based on the "reason and spirit underlying" the provision, the "clear intent" of the electorate in enacting article 10, section 4, was "to promote a broad and merit-based process for the selection of judicial nominees." And in *Opinion to the Governor*, 83 R.I. 370, 116 A.2d 474 (1955), all four participating justices construed the purpose of article 9, section 6 (now article 3, section 6) as follows:

"In this connection it is unnecessary to restate the history of our constitution and to establish the fact that from the beginning Rhode Island has been exceptionally jealous of its independence and sovereignty as a state. For the present problem it is sufficient to point to the explicit provisions * * * of our constitution which are as strong, if not stronger, than similar prohibitions found in the constitutions of the other states.

"The intent of that language is clear. It was designed to secure the undivided loyalty and service of such officers to this state. The framers of the constitution deemed it prudent to prevent even the possibility of a conflict between loyalties. Therefore they dealt with the problem in two ways. In the first clause of sec. 6 they provided that no person while holding an office under any other government, state or country could act as a general officer or as a member of the general assembly. Apparently not content with this exclusion they then provided in the second clause that if any such officer or judge, after his election and engagement, accepted *any appointment* under any other government then his said office shall be immediately vacated." *Opinion to the Governor*, 83 R.I. at 372–73, 116 A.2d at 474–75.

Notwithstanding the use of the word "election," I believe that article 3, section 6 can coexist in harmony with article 10, section 4 without diluting the purpose of either provision. This Court has recognized that we must not be hasty in our interpretation of the Constitution because an instrument like the Constitution "must of necessity deal in generalities." *In re Opinion of the Court to the Governor in the Matter of the Constitutional Convention*, 55 R.I. 56, 86, 178 A. 433, 447 (1935). "[T]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary sense as distinguished from technical meaning." *In re Advisory Opinion (Chief Justice)*, 507 A.2d 1316, 1323 (R.I. 1986) (quoting *United States v. Sprague*, 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931)).

When we are called upon to construe the provisions of coexisting statutes, we at-

tempt to follow the rule of construction that provides that provisions "relating to the same or similar subject matter should be construed such that they will harmonize with each other and be consistent with their general objective scope." *Blanchette v. Stone*, 591 A.2d 785, 786 (R.I.1991). "This rule of construction applies even though the [provisions] in question [may] contain no reference to each other and are passed at different times." *Id.* (quoting *State v. Ahmadjian*, 438 A.2d 1070, 1081 (R.I.1981)). In light of Mr. Justice Story's admonition against construing "any clause of the Constitution as to defeat its obvious ends, when another construction, equally accordant with the words and sense thereof, will enforce and protect them," *Prigg*, 41 U.S. (16 Pet.) at 612, I believe that the word "election" [19] should be interpreted broadly to effectuate the purpose of article 3, section 6, *viz.*, securing the "undivided loyalty and service of such officers to this state." Thus, the word "election" in article

3, section 6 may be viewed as encompassing the "selection" or "appointment" of the officers explicitly enumerated therein.[20] Whether these individuals are elected through popular elections, elected through Grand Committee elections, or appointed through the joint efforts of the executive and legislative branch is extraneous to the intent and function of article 3, section 6.

Consistent with these principles, I believe that article 3, section 6 should be interpreted so as to give vitality to its purpose—"to secure the undivided loyalty and service" of a discreet class of public officers. Although the adoption of the 1994 amendment to article 3, section 4 formally altered the selection process by which judges are chosen, it does not compel the conclusion that such judges are thereby excised from the operation of article 3, section 6. In my opinion, the word "election" as it appears in that section should be viewed in its broader, more gen-

---

**19.** "In construing a constitutional provision, this court properly consults extrinsic sources * * *. * * * In our examination of the constitution, we must look to the history of the times and examine the state of affairs as they existed when the constitution was framed and adopted." *In re Advisory Opinion to the Governor (Rhode Island Ethics Commission—Separation of Powers)*, 732 A.2d 55, 91 (R.I.1999) (quoting *City of Pawtucket v. Sundlun*, 662 A.2d 40, 45 (R.I.1995)). A dictionary relevant to the time of the adoption of article 3, section 6 gives a definition of the word "election": "The act of choosing a person to fill an office or employment, by any manifestation of preference, as by ballot, uplifted hands or viva voce[.]" American Dictionary of the English Language (Noah Webster 1828). Other state's supreme courts have examined the words "elect" and "appoint" and determined that they are interchangeable. *See, e.g., Edmonds v. Bronner*, 547 So.2d 1172, 1176–77 (Ala.1989) (holding that whether an officer is a public officer under that state's constitution "must be determined by examining the duties of the office, the 'being there,' rather than the method by which the officer is selected, i.e.,

appointment or election, the 'getting there.' " The court noted in dicta that " '[e]tymologically speaking, election denotes choice, selection out of the number of those choosing.' In common use, however, it has come to denote such a selection made by a distinctly defined body, as by 'the voters of an entire class,' and while the words 'appointment' and 'election' are not synonymous, yet they are sometimes used interchangeably in statutes. * * * 'In its broadest sense, * * * the word "elected" means merely "selected".' ").

**20.** "The words 'elect' and 'appoint' are not legally synonymous; the term 'election' carries with it the idea of a choice in which all who are to be affected by the choice participate, whereas an appointment is generally made by one person or by a limited number acting with delegated powers. The words, however, are sometimes indiscriminately employed in constitutional and statutory provisions, and for the purpose of ascertaining the correct interpretation, the courts must give to the word used a meaning according to the connection in which it is found." 25 Am. Jur.2d *Elections* § 1 at 799 (1996).

eral sense that encompasses the "selection" or "appointment" of the explicitly enumerated officers.

In summary, I do not believe that the 1994 amendment to article 10, section 4 is irreconcilably repugnant to article 3, section 6. Rather, I believe that the rules applicable to the construction of constitutional provisions suggest an interpretation that favors giving effect to both provisions. In my opinion, the 1994 amendment to article 10, section 4 does not render the phrase "judge * * *, after election and engagement" in article 3, section 6 a legal nullity. On the contrary, both provisions may stand in harmony to effectuate the intent of the people: the selection of judges on the basis of merit, and the assurance of the undivided loyalty and service of such judges. Therefore, I respectfully dissent from the majority's holding on this issue.

Finally, I think it important to note the extraordinary circumstances occasioned by this case, in which we have been called upon to consider a complaint, the subject of which is a colleague with whom we all enjoy a close working relationship. The fact that we have read the same constitutional provisions, and applied well-established rules of statutory construction, yet come to differing conclusions should not obscure the fact that we agree on what I consider to be the dispositive issues of this case, *i.e.*, that the plaintiffs have no standing and that the action may only be brought by the Attorney General. For the reasons I have set forth herein, however, I believe that the provisions of article 3, section 6 continue to have vitality for judges, as well as for general officers, senators, and representatives. The Chief Justice is as much subject to the law as any other public officer or, indeed, any other citizen. By the same token, the Chief Justice is as much entitled to the protec-

tions of our well-settled jurisprudence as any other public officer or citizen. Accordingly, I concur with the judgment of the majority to dismiss the plaintiffs' complaint.